EAGLE TRUCK TRANSPORT, INC., A CORPORATION OF THE STATE OF DELAWARE, APPELLANT, v. BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY OF THE STATE OF NEW JERSEY, AND BERNARD CARROLL, SR., RESPONDENTS.

Argued February 3, 1959—Decided March 10, 1959.

*Mr. C. Russell Kramer* argued the cause for appellant (*Messrs. Reed, Reynolds, Smith & Kramer,* attorneys).

*Mr. Edward A. Kaplan* argued the cause for respondent Board of Review, etc. (*Mr. Clarence F. McGovern,* attorney).

The opinion of the court was delivered by

FRANCIS, J. Bernard Carroll, Sr. was granted unemployment compensation benefits. The employer, Eagle Truck Transport, Inc., sought a review in the Appellate Division of the Superior Court but the matter was certified on our motion before decision there.

■ Carroll, a resident of Brooklyn, New York, was employed as a truck driver for eight years by Eagle, whose place of business is in Jersey City, New Jersey. On January 23, 1958 he resigned under circumstances constituting a voluntary quit. It is undisputed that his work record and contributions to the unemployment compensation fund were adequate to warrant a claim for benefits if the cessation of work had been involuntary. After quitting he obtained employment of the same type with different employers in Brooklyn. On March 10, 1958 he became unemployed in-

voluntarily and two days later sought compensation under the New Jersey law against Eagle, his former employer in this state. The claim was filed in the New York office of our Division of Employment Security. *N. J. S. A.* 43:21-1 *et seq.* Benefits were allowed beginning March 24, 1958, on the ground that the disqualification resulting from the voluntary quit of January 23, 1958 had been tolled by the subsequent out-of-state employment, in which Carroll had earned at least four times his New Jersey benefit rate. The award is challenged by the respondent employer on the theory that the wages received in Brooklyn did not operate to requalify him since they were not earned in New Jersey with an employer who was subject to the law of this state.

In support of the position, reliance is placed upon *N. J. S. A.* 43:21-5(*a*) and 43:21-19(*i*), the sections of the act dealing with disqualification and definition of employment. *N. J. S. A.* 43:21-5 in part provides:

"An individual shall be disqualified for benefits:

"(a) For the week in which he has left work voluntarily without good cause, and for each week thereafter until he has earned in employment (*which may be with an employing unit having in employment one or more individuals*) at least four times his weekly benefit rate, as determined in each case." (Emphasis supplied.)

The argument is that "in employment" refers to New Jersey employment which is normally covered by the act or to work of the type included as "employment" under the act, and performed in this State for an "employing unit" having in employment one or more individuals.

*N. J. S. A.* 43:21-19(*i*)(1) defines "employment" to mean

"[S]ervice, including service in interstate commerce performed for remuneration or under any contract of hire, written or oral, express or implied."

The inclusion of service in interstate commerce requires special comment. The Legislature of New Jersey, as well as those of other jurisdictions, recognized that work for some employers would be rendered partly in this State and

partly in one or more sister states and that confusion might arise as to where such employees would have to make their tax contributions and whether they would be protected in case of unemployment by our act or by that of some other state wherein they were also engaged. To avoid this difficulty the lawmakers of every jurisdiction of this country, including New Jersey, adopted substantially uniform measures to localize interstate employment for purposes of employer and employee contributions and liability for benefits. 1 *C. C. H. Unemployment Insurance Reporter*, §§ 1334, 2050. Thus the subparagraphs of section 19(*i*) of our act say:

"The term 'employment' shall include an individual's entire service, performed within or both within and without this State if * * *."

There follows a specification of variant circumstances under which interstate service shall be deemed to call for contributions to our fund, and its amenability to claims of employees so occupied in the event of involuntary unemployment. However, we are not concerned here with any problem arising out of interstate employment. Carroll's work, which is said to have removed his disqualification, was intrastate but performed in New York. Under ordinary circumstances such occupation would be subject to the law of that state and ultimately would result in qualifying him for benefits there when sufficient work credits and contributions had been accumulated. 30 *McKinney's Consolidated Laws of New York, c. 31, p. 376, Labor Law,* § 511. The unusual problem before us is whether employment as a truck driver in another state which produced at least four times the New Jersey unemployment compensation rate purged the disqualification of a former New Jersey employee who, if the work had been performed here, would be entitled to benefits. Resolution of the issue must turn upon the construction of "in employment" and the parenthetical clause following it ("which may be with an *employing unit having in employment one or more individuals*") (emphasis re-

peated) in subsection 5(a), *supra*. In seeking the intent manifested by that phraseology we cannot be unmindful of our obligation to interpret any ambiguity therein so as to accomplish, if possible, the beneficent social purpose of the Legislature. That objective is not achieved by a rigid, narrow connotation which contravenes the basic spirit and central scheme of the law. *N. J. S. A.* 43:21–2; *Alexander v. N. J. Power & Light Co.*, 21 *N. J.* 373, 378 (1956); *Valenti v. Board of Review of U. C. C. of N. J.*, 4 *N. J.* 287, 292 (1950); *Ford Motor Co. v. N. J. Dept. of Labor & Industry*, 7 *N. J. Super.* 30 (*App. Div.* 1950), affirmed 5 *N. J.* 494 (1950); *Singer Sewing, &c., Co. v. N. J. Unemployment, &c.*, 128 *N. J. L.* 611, 616 (*Sup. Ct.* 1942), affirmed *per curiam* 130 *N. J. L.* 173 (*E. & A.* 1943).

█ In the day-to-day operation of the Compensation Law when benefits are sought by an unemployed person, the inquiry is a retrospective one. Prior to the loss of his position, did he earn sufficient credits in employment in this State by rendering intrastate or the specified interstate service for remuneration under any contract of hire? Such an employee does not have to be a resident of New Jersey (with an exception not here material) either while establishing the work credits or at the time of the making of the claim. For example, a person who becomes involuntarily unemployed may accept work in another state and yet retain his rights under our act during the benefit year. So if he loses his position there during such year and before the accumulation of enough service credits to entitle him to recover in that state, he may have recourse to the New Jersey fund, so long as he keeps himself available for work as required by *N. J. S. A.* 43:21–4(c) in either or both states. *Cf. Berry, Whitson & Berry v. Div., etc., Dept. of Labor and Ind.*, 21 *N. J.* 73 (1956); *Bliley Electric Co. v. Unemployment Comp. Bd. of Rev.*, 158 *Pa. Super.* 548, 45 *A. 2d* 898 (*Super. Ct.* 1946); and see *Regulation 26*, Division of Employment Security, (1956).

Moreover, the legislatures of all 49 states became aware that they would have to make provisions for persons who

move from state to state in employment and accumulate work credits in each jurisdiction. Accordingly, they adopted the Interstate Benefit Payment Plan which was approved by the Interstate Conference of Employment Security Agencies, and under which benefits are to be paid to unemployed workers absent from the particular state where work credits have been garnered. The plan makes it possible for such individuals to collect unemployment benefits from a state in which they have qualifying wages, although they are not present in that state. Under the procedure established, each state acts as agent for the other in taking claims. And the liable state pays benefits computed on the basis of wages earned under its law and determined under its benefit formula on the claims filed in the local office of the agent state. *C. C. H., supra,* § 2050. Accepting the premise that our free enterprise system includes among its fundamentals the mobility of labor, the New Jersey statute authorized the making of such interstate arrangements, and the Uniform Benefit Plan referred to was adopted by the Director of the Division of Employment Security. *N. J. S. A.* 43 :21–21; *Regulation* 26, *supra; "Interstate Aspects of Unemployment Insurance,"* 8 *Vanderbilt L. Rev.* 478 (1955). In such cases, if a claimant with outstanding credits in two states presents a claim to one of them and it is determined that benefits are payable, no further demand can be made against the second state until payments under the first claim have been exhausted. *Regulation* 26.04.

The significance of the acceptance by this State of the reciprocal agreement in the present context is that when the Legislature was engaged in the consideration of the 1950 amendment of subsection 5($a$) which created its present form, it was fully conscious of problems of multistate employment. It knew that a worker who became involuntarily unemployed in New Jersey and who had work credits here would be entitled, if he obtained and subsequently lost employment in the State of New York, to claim benefits from his base employer in New Jersey, either before or after exhausting any accumulated credits in New York (short of

full compensation under our statute), or immediately after becoming unemployed, if he had not worked long enough in New York to amass any credits there. It knew, also, that under the rules of the Division of Employment Security when such a claim was made on the New Jersey fund following loss of the New York employment, the employee satisfied the mandate for attachment to the labor market by registering at any public employment office in New York. *Regulation* 26.03. Under the circumstances, it is scarcely conceivable that the lawmakers were not conscious of the need for a decision as to whether the voluntary quit worker should be able to purge himself of the disqualification by earning four times his benefit rate in another state. In this connection, also, it must be said that the spirit of the law in its then existing state, particularly as it was manifested by the acceptance of the fact of multistate employment, would suggest a favorable resolution of the problem. And our study of the amendment has led to the conclusion that such a means of removing the bar to benefits was promulgated.

As originally enacted, subsection 5(*a*) disqualified a voluntary quit worker for the week in which he left work and for the three weeks which immediately followed (in addition to the waiting period). *R. S.* 43:21–5(*a*). For the person who had sufficient work credits this, in effect, was simply a postponement of and a partial loss of benefits. At the end of the penalty period he became entitled to payment so long as he made himself available for work under *R. S.* 43:21–4, even if he obtained no employment during the statutory payment period. And there was nothing in the act which called for residence or availability for work in New Jersey only.

In 1950 (*L.* 1950, *c.* 172, *p.* 374), the provision was modified by adoption of the present formula under which disqualification is imposed for the week of the quit and thereafter until the worker has earned in employment ("which may be with an employing unit having in employment one or more individuals") at least four times his weekly benefit rate. Admittedly, when such amount is

earned in New Jersey, he becomes absolved from the disqualification and returns to the fold of those eligible for benefits with all of the virtue of the biblical ninety and the nine. If he suffers involuntary unemployment the next day after achieving that earning point, his right to compensation is unquestionable, so long as he satisfies the availability for work requirement. Should a voluntary quit employee who has compiled a sufficient service record in New Jersey to be entitled to benefits, be deprived of them if, in good faith, he takes employment in New York, earns his purging credits there, and then becomes the victim of unemployment? The humanitarian motive of the law would dictate a negative answer unless the pertinent language clearly excludes him. *Bliley Electric Co. v. Unemployment Comp. Bd. of Rev., supra,* 45 *A.* 2*d* at *page* 904. Eagle contends that the design to do so is manifested by the requirement that the earnings must be "in employment" when those words are considered in a context referring to "employing unit." The suggestion is predicated upon the general principle of statutory construction that when the Legislature has specifically defined a term, the courts are bound by the definition. 2 *Sutherland, Statutory Construction* (3*d ed.* 1943), § 4814. "Employing unit" is defined in subsection 19(*g*) as

"[A]ny individual * * * or corporation * * * [which has] in its employ 1 or more individuals performing services for it *within this State.*" (Emphasis supplied.)

And according to the introductory sentence of the section, that significance is to be attached to it "unless the context clearly requires otherwise." But the Legislature took pains to redefine "employing unit" in the amendment of 5(*a*). It did not simply repeat the 19(*g*) definition therein. The specification for the performance of the services "within this State" was omitted. If the words "employing unit" alone had been inserted, undoubtedly the conclusion would be drawn that the given general statutory connotation was meant. So the fact that only part was included shows an inescapable intention to qualify the general definition by

eliminating any requirement that the wages which would remove the disqualification had to be earned in New Jersey. Such a conclusion is entirely in harmony with the liberal attitude of the law, as exhibited above, toward interstate and multistate employment. Any other result would be a discordant one. The effort seems to have been to encourage the employee to resume work as soon as possible and to restore his right to benefits as soon as he had demonstrated genuine attachment to the labor market by earning four times his weekly benefit rate.

The suggestion has been advanced that if it was not intended to confine the purging work to this State, the result could have been accomplished by omitting the parenthetical clause entirely. That may be true. But then doubt would be engendered as to whether "in employment" meant employment of the type included under the law and with a subject New Jersey employer. Clearly, one reason why the reference was made to the employing unit employing one or more individuals was to indicate that the services did not have to be rendered for a subject employer, *i. e.,* one having four or more individuals "in employment." Subsection 19(*h*)(1). And to say that local employment was meant would be to divest the act of the Legislature in dropping the mandate for the rendition of services for an employing unit "within this State" of all reasonable significance. What, then, does "in employment" denote in this framework? As defined in the statute, "employment" does not include certain types of work, such as agricultural labor, domestic service in a private home, and various other occupations which are specified in subsection 19(*i*)(7). Thus, although it was considered germane to the overall purpose of the law to sanction out-of-state work for an employer having no more than one employee as a basis for removing a voluntary quit disqualification, the desire and aim were to require the work to be "in employment," *i. e.,* in the *type* employment declared to be such by the New Jersey act. In this way there would be no enlargement of the kinds of work classified as "employment."

The Board of Review seems to have taken the broad view that any services performed for remuneration in or out of New Jersey would reinstate the right to benefits so long as the earnings amounted to at least four times Carroll's weekly benefit rate. We cannot agree. To reach that result, the words "in employment" which appear twice in $5(a)$ would have to be ignored. The context is not sufficiently clear to justify the conclusion that the legislative purpose was to include as "employment" classes of work which, by the express statement of subsection $19(i)(7)$, are not included. Enlargement of the liability of the fund in that fashion should not be recognized unless clearly manifested by the language of the amendment.

Our attention has been called to the fact that prior to *In the Matter of Leo N. Brown,* B. R.–41945–C (1958), the Board of Review had construed the 1950 amendment of $5(a)$ as requiring the purgative employment to be served in covered employment with a New Jersey employing unit. In that case, however, after a thorough reconsideration of the problem, the earlier view was found to be erroneous and the Board declared that subsequent wages in the required amount earned in another state would remove the disqualification. Eagle not only contends that the *Brown* ruling is incorrect but points also to the legislative history in support of its position. It does appear that subsequent to the earlier agency decisions referred to, bills were submitted to the Legislature (under whose sponsorship the record does not disclose) for the purpose of overruling them. None of these proposals was ever adopted. There is no doubt that the failure of the lawmakers to amend a statute after a construction has been placed upon it by an agency charged with its administration is often spoken of as some evidence that the interpretation accords with their intent in enacting it. *Barringer v. Miele,* 6 *N. J.* 139, 144 (1951). However, the inference is not at all conclusive and cannot be considered as a bar to a later determination by the agency or by the courts that the earlier view was erroneous.

The judgment is affirmed.

292

BURLING, J. (dissenting). In approaching the interpretive question herein, enlightenment on legislative intent wherever found must be carefully considered. The aid obtained from the legislative conduct since enactment of the 1950 amendment to 5(a) leads to a construction that the disqualification for benefits resulting from a voluntary quit is not tolled by employment with an out-of-state employer. On this point, the majority assert that:

"There is no doubt that the failure of the lawmakers to amend a statute after a construction has been placed upon it by an agency charged with its administration is often spoken of as some evidence that the interpretation accords with their intent in enacting it. *Barringer v. Miele*, 6 N. J. 139, 144 (1951). However, the inference is not at all conclusive and cannot be considered as a bar to a later determination by the agency or by the courts that the earlier view was erroneous."

There is here not merely legislative silence or inaction following administrative interpretation, but a failure to enact a proposed change in the law. The sponsors of amendments designed to override the administrative construction placed the problem in specific terms squarely before the Legislature.

In 1951, the year following the 1950 amendment to 5(a), the meaning of which we are presently concerned with, there was introduced in the House of Assembly a bill to further amend 5(a). That bill as reported by the Unemployment Compensation Committee of the House of Assembly deleted the crucial phrase "earned in employment (which may be with an employing unit having in employment one or more individuals)" and substituted therefor the language "worked and earned thereafter in any type of service an amount equal to at least four time his weekly benefit rate, as determined in each case." (*Assembly Bill* 172 (1951).) The bill passed the Assembly and reposed in the Senate Committee on Labor Industries and Social Welfare. Had it passed, it would have obviated the present problem. By taking out the words "in employment" and substituting the words "in any type of service" the bill would eliminate the necessity for "covered employment" in order to toll disqualification and would also allow excluded employments

such as agricultural to toll disqualification. That the Legislature was aware that 5(a) in its present form did not operate to toll disqualification for benefits under the facts in the instant case is made patently apparent from the introducer's statement to *Assembly Bill* 172 which reads:

"Subsection 5(a) was amended last year by *Chapter* 172 *P. L.* 1950. Through inadvertence, the new provisions were made unduly harsh upon the employee in purging his voluntary quit without good cause. The 1950 provision permits the employee to lift the disqualification only by working *in employment covered by the New Jersey law*. Also it prevents the worker from lifting the disqualification if he works in *excepted* or *excluded* employment; for example, on a farm, in a home, etc. *It has been found particularly severe in the case of those workers who live in the metropolitan areas and who procure jobs across State lines. Inasmuch as work in the other States is very seldom performed for a New Jersey employer or covered by the New Jersey law, the work performed in the other States, and the remuneration received therefor, do not count in favor of the disqualified employee.*

The new rewrite both eliminates all these objections and carries out the fundamental purpose of the disqualification feature. The worker is asked to demonstrate that he has genuinely rejoined the labor market. He should be permitted to make his demonstration by working *wherever a job is available* to him and in the kind of job to which he succeeds in attaching himself." (Emphasis supplied)

From the Legislature's viewpoint, the construction presently urged by Eagle was admitted and the salient fact, so far as we are concerned, is that such a construction did not move the Legislature to action. From such fact I can only infer an acquiescence in the Board's original construction of the act.

Other amendments to 5(a), with similar statements of purpose appended to that included in *Assembly Bill* 172 (1951) were unsuccessfully proposed each year since 1951. 1952 (*Assembly Bill* 236); 1953 (*Assembly Bill* 437); 1954 (*Assembly Bill* 81); 1955 (*Assembly Bills* 4 and 224); 1956 (*Senate Bill* 264) (*Assembly Bill* 21); 1957 (*Senate Bills* 19, 127, 241); 1958 (*Senate Bills* 30, 303); 1959 (*Assembly Bill* 389).

*Assembly Bill* 437 (1953), as reported by Committee Substitute passed in the Assembly, was received in the

Senate and given a second reading, but no action was taken thereafter. *Assembly Bill* 81 (1954) as reported by Committee Substitute, likewise passed the Assembly, was given a second reading in the Senate, and thereafter was recommitted to the Judiciary Committee of the Senate where it reposed. The Committee Substitute of *Assembly Bill* 437 and *Assembly Bill* 81 did not change the crucial language from the original proposals. The other bills above referred to, with the exception of *Assembly Bill* 236 (1956) which received a second reading in the Assembly, were not reported out of committee. Other proposed amendments to 5(*a*) which failed of enactment and which do not contain statements of purpose specifically referring to the present problem but which might also be construed so as to allow tolling of disqualification under the instant facts are: *Assembly Bill* 287 (1951); *Assembly Bill* 201 (1952); *Senate Bill* 265 (1956); *Senate Bill* 192 (1957); *Assembly Bills* 286, 510 (1957); *Senate Bill* 74 (1958); *Assembly Bills* 98, 339 (1958); *Assembly Bill* 301 (1959), which passed Assembly February 16, 1959 and was on that date referred to Senate Committee.

If we once accept legislative history as a relevant interpretive guide, see *Deaney v. Linen Thread Co.*, 19 *N. J.* 578 (1955), then we ought to follow where it logically leads. The majority have accomplished what the sponsors of the many bills failed to achieve, and what the Legislature has not thought provident to enact. This, I think, borders on judicial legislation in its accurate sense, *i. e.*, the substitution of the judicial view of the wisdom of a particular policy in instances where a contrary legislative view is expressed or where, as here, fairly implicit.

Accordingly I vote to reverse the order from which the appeal has been taken.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, JACOBS, FRANCIS and PROCTOR—5.

*For reversal*—Justice BURLING—1.