802 A.2d 496

DOROTHY MATTURRI, PHYLLIS HEALY AND THE SURVIVING CHILDREN OF THE HONORABLE JOSEPH HEALY, AND THE RETIRED JUDGES ASSOCIATION OF NEW JERSEY, PETITIONERS–APPELLANTS, v. BOARD OF TRUSTEES OF THE JUDICIAL RETIREMENT SYSTEM, RESPONDENT–RESPONDENT.

Argued September 24, 2001—Decided July 24, 2002.

370

*Robert E. Margulies* argued the cause for appellants (*Margulies, Wind, Herrington & Knopf*, attorneys; *Jack Jay Wind*, on the briefs).

*Carol Johnston*, Deputy Attorney General, argued the cause for respondent State House Commission, Board of Trustees of the Judicial Retirement System (*John J. Farmer, Jr.*, Attorney Gen-

eral of New Jersey, attorney; *Patrick DeAlmeida,* Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

PORITZ, C.J.

This appeal raises an issue of statutory construction affecting survivorship benefits under the Judicial Retirement System Act, *N.J.S.A.* 43:6A–1 to –47 (JRSA or Act). More specifically, the Court must decide whether such benefits are calculated once at the time a member of the retirement system dies, or rather, are adjusted periodically after a member's death to reflect increases in judges' salaries that occur later.

## I

Appellants are Dorothy Matturri, (widow of the late Judge Alexander Matturri), Phyllis Healy and her minor children (the widow and children of the late Judge Joseph Healy), and the Retired Judges Association of New Jersey (RJANJ or Association). Judge Matturri and Judge Healy were members of the Judicial Retirement System (JRS) established by the JRSA, and their surviving spouses and children are entitled to receive benefits pursuant to that Act. RJANJ is an unincorporated nonprofit organization that represents the interests of JRS members who will likely leave spouses and/or children, and that here represents the surviving spouses and children of judges that have passed away.

The facts in this matter are uncontested. Judge Healy died in 1995 while in active service. His surviving spouse receives an annual survivor's benefit, pursuant to *N.J.S.A.* 43:6A–17, that is paid monthly and calculated at twenty-five percent of $100,000, Judge Healy's salary at the time of his death. Although the record does not so state, we note that Judge Healy's two surviving minor children receive annual benefits of fifteen percent of his final salary under *N.J.S.A.* 43:6A–17.

Judge Matturri retired from the Superior Court in 1983. From his retirement until his death in 1990 he received a pension of $52,500 per year, constituting three-fourths of his salary at the time of his retirement. *See id.* at –8e. Pursuant to *N.J.S.A.* 43:6A–18, Judge Matturri's surviving spouse, like Judge Healy's spouse, receives an annual survivor's benefit in the amount of twenty-five percent of $100,000 ($100,000 having been the salary for a sitting judge in 1990, the time of Judge Matturri's death). We also note that the survivorship benefits received by Mrs. Matturri, Mrs. Healy, and the Healy children are subject to cost-of-living adjustments pursuant to the Pension Adjustment Act, *N.J.S.A.* 43:3B–1 to –10, as was the pension Judge Matturri received.

The Division of Pensions and Benefits (Division) calculates benefits for a judge's survivors based on the salaries for judges that were "current" at the time of that judge's death, and then fixes benefit payments in accordance with that calculation. Appellants argue that survivorship benefits should be adjusted whenever salaries for active judges are increased by the Legislature because *N.J.S.A.* 43:6A–17 and –18 direct the Division to base such benefit payments on the "current" salaries for sitting judges. *N.J.S.A.* 43:6A–17, which grants benefit payments to the survivors of judges who pass away while in active service, provides:

a. Upon the receipt of proper proofs of the death in active service of a member of the retirement system, there shall be paid to his widow[1] a survivor's benefit of 25% of final salary for the use of herself, to continue during her widowhood, plus 10% of final salary payable to one surviving child or plus 15% of final salary to two

---

1 "When used in [JRSA], the term 'widow' shall mean and include 'widower' as may be necessary and appropriate to the particular situation." *N.J.S.A.* 43:6A–3t. For purposes of JRSA, "widow" refers to

the woman to whom a member or a retirant was married at least 4 years before the date of his death and to whom he continued to be married until the date of his death. The eligibility of such a widow to receive a survivor's benefit will be considered terminated by the marriage of the widow subsequent to the member's or the retirant's death. In the event of accidental death the 4-year qualification shall be waived.

[*Ibid.; see also id.* at –3u (providing analogous definition for "widower").]

or more surviving children; if there is no surviving widow or in case the widow dies or remarries, 15% of final salary will be payable to one surviving child, 20% of final salary to two surviving children in equal shares and if there be three or more children, 30% of final salary will be payable to such children in equal shares. If there is no surviving widow or child, 20% of final salary will be payable to one surviving parent or 30% of final salary will be payable to two surviving parents in equal shares.

b. In addition to the foregoing benefits payable under subsection a., there shall also be paid in one sum to the member's beneficiary an amount equal to one and one-half times the final salary received by the member.

c. For the purposes of this section final salary means the current salary for the judicial position in which the member served at the time of death.

Most relevant here, subsection c of the Act defines "final salary," thereby establishing the basis for the benefit calculations.

*N.J.S.A.* 43:6A–18 authorizes benefits for survivors of JRS members who die after retirement. Section 18 provides:

Upon the receipt of proper proofs of the death after retirement of a member of the retirement system, there shall be paid to his widow a survivor's benefit of 25% of final salary for the use of herself, to continue during her widowhood, plus 10% of final salary payable to one surviving child or plus 15% of final salary to two or more surviving children; if there is no surviving widow or in case the widow dies or remarries, 15% of final salary will be payable to one surviving child, 20% of final salary to two surviving children in equal shares and if there be three or more children, 30% of final salary will be payable to such children in equal shares. For the purposes of this section final salary means the current salary for the judicial position in which the member served at retirement.

The definition of "final salary" found in Section 18 is substantially the same as the definition provided in Section 17. For sections of the JRSA other than *N.J.S.A.* 43:6A–17 and –18, "final salary" is defined as "the *annual* salary received by the member at the time of his retirement or death." *N.J.S.A.* 43:6A–3g (providing definitions for JRSA) (emphasis added).

Appellants claim that the benefits paid to the surviving spouses of Judges Matturri and Healy should have been increased each time judicial salaries increased after their husbands died. The annual salary for sitting Superior Court judges was raised to $115,000, effective February 1996, and subsequently, to $133,330 for calendar year 2000, $137,165 for calendar year 2001, and $141,000 for calendar year 2002. *N.J.S.A.* 2B:2–4.

## II

In separate letters dated January 29, 1999, the State House Commission (Commission), "sitting as the Board of Trustees of the Judicial Retirement System,"[2] denied requests made by the Healy and Matturri families for a recalculation of their survivors' benefits. The Commission then transferred the families' appeals to the Office of Administrative Law (OAL) as contested cases pursuant to *N.J.A.C.* 1:1–3.2 The matters were consolidated and the parties stipulated to the facts in August 1999. RJANJ was permitted to intervene by consent shortly thereafter, and the parties presented legal argument to Administrative Law Judge (ALJ) Springer in October 1999.

ALJ Springer issued his Initial Decision on July 14, 2000. He disagreed with the Commission and concluded that the plain language of the Act requires the recalculation of survivorship benefits to reflect increases in judicial salaries after a judge dies. In his view, the term "current" clearly and unambiguously conveys a legislative directive to update (increase) survivors' benefits as judicial salaries change. Based on a *Webster's New International Dictionary* definition of "current" as "presently elapsing: occurring in or belonging to the present time," he opined that "[c]urrent conveys the sense of periodic change or updating to keep abreast of modern trends." He suggested, also, that it would have been unnecessary for the Legislature to insert "current" into the definition of "final salary" had it intended final salaries to be fixed, citing *Franklin Tower One, L.L.C. v. N.M.*, 157 *N.J.* 602, 613, 725 *A.*2d 1104 (1999) ("[L]egislative language must not, if reasonably avoidable, be found to be inoperative, superfluous or meaningless.") (citations omitted). Because the phrases "at the time of death" and "at retirement," are closer in their respective para-

---

2 *N.J.S.A.* 43:6A–29a provides: "[T]he general responsibility for the proper operation of the [judicial] retirement system is ... vested in the State House Commission." The Commission "establish[es] rules and regulations for the administration of the funds created by" the Judicial Retirement System Act. *Id.* at –29d.

graphs to "judicial position" than to "current salary," ALJ Springer found that they were meant to specify the last "judicial position in which [a] member served" and not to qualify the adjective "current."

On July 18, 2000, the Division received the ALJ's Initial Decision, which was forwarded to the Commission's liaison within the Division. Pursuant to *N.J.S.A.* 52:14B–10(c), the Commission was required to modify or reject the decision within forty-five days (September 1, 2000). If the Commission failed to act, the ALJ's decision would "be deemed adopted as the final decision of [that body]." *Ibid.* The Attorney General, acting on behalf of the Division, applied to the Commission on August 1, 2000, and then again on August 18, 2000, for an extension of time within which to file exceptions to the Initial Decision. The Commission did not respond, but the Attorney General, nevertheless, filed exceptions with the Commission on September 7, 2000.

Respondents assert that the first time the Commission saw ALJ Springer's Initial Decision was on September 18, 2000, when it received the decision from its liaison within the Division. On that day, sixty-two days after receipt by the Division, the Commission applied to the OAL for an extension of time to file its Final Decision. On September 22, 2000, ALJ Tylutki, acting in the absence of Chief Administrative Law Judge Masin, granted the Commission's request *nunc pro tunc.* Six days later, Chief Judge Masin rejected appellants' motion for reconsideration, explaining that "this particular situation is one in which it would be inappropriate to exercise the director's discretion to deny consent to an extension [because] . . . this agency . . . rarely appears before the Office of Administrative Law [and] did not have in place appropriate procedures to assure that the procedural requirements of extensions were met."

The Commission convened on October 5, 2000 to review ALJ Springer's decision, and issued its Final Decision on October 13, 2000. It concluded that survivorship benefits under *N.J.S.A.* 43:6A–17 and –18 are not required to be recalculated whenever

salaries for active judges are increased. Like the ALJ, the Commission found the phrase "current salary" clear in the sense that it sets a fixed, benchmark salary to be used for the calculation of survivorship benefits." Unlike the ALJ, the Commission found the phrase ambiguous "in connection with any further meaning," and therefore looked to extrinsic factors to discern that meaning.

First, the Commission examined other language in sections 17 and 18 supporting the conclusion that survivors' benefit payments are fixed. Both N.J.S.A. 43:6A-17 and -18 begin: "Upon the receipt of proper proofs of the death ... of a member of the retirement system, there shall be paid to his widow a survivor's benefit...." In the Commission's view, that language indicates that survivors' benefits are calculated on the judicial salary that is "current" at the time "proper proofs of death" are received by the Division. The Commission also noted that in the Pension Adjustment Act, N.J.S.A. 43:3B-1 to -10, the Legislature specifically directed benefit recalculation based on a cost-of-living formula, N.J.S.A. 43:3B-2, demonstrating that when the Legislature intended to authorize recalculation, it knew how to say so. The absence of explicit language providing for the adjustment of pension benefits in the JRSA suggests, therefore, that the Legislature did not intend such adjustments to be made when the salaries of sitting judges are increased. Finally, the Commission accorded great weight to the Division's interpretation of the JRSA, stating that neither the Judiciary nor the Legislature has interfered with the Division's practices since the Act was amended "almost twenty years" ago. For those reasons, among others, the Commission affirmed those practices in this case.[3]

---

[3] The Commission also reasoned that its interpretation of the Act permits the benefits provided under N.J.S.A. 43:6A-17 to be harmonized. Because the life insurance payment provided by subsection b is made in one lump sum, it is not subject to continual adjustment to reflect changes in judicial salaries. The Commission's interpretation of "current salary" allows for the same fixed calculation of a judge's final salary for purposes of both subsection a and subsection b. On its consideration of the legislative history of L. 1981, c. 470, the Commission found that the language "current salary" simply reflected the

On January 17, 2001, we directly certified petitioners' appeal on our own motion.

## III

■ Appellants argue that ALJ Tylutki and Chief Judge Masin should have denied the Commission's request for an extension to file its final decision *nunc pro tunc.* Rather, ALJ Springer's findings of law should have been "deemed adopted" by the Commission pursuant to the Administrative Procedure Act (APA) at *N.J.S.A.* 52:14B–10(c).

In respect of contested cases involving administrative agencies, that statute provides:

The head of the agency, upon a review of the record submitted by the administrative law judge, shall adopt, reject or modify the recommended report and decision no later than 45 days after receipt of such recommendations.... Unless the head of the agency modifies or rejects the report within such period, the decision of the administrative law judge shall be deemed adopted as the final decision of the head of the agency.

Although the APA allows the OAL to grant an extension for good cause, it is silent as to whether such an extension may be granted after the expiration of the forty-five day period. See *N.J.S.A.* 52:14B–10(c). However, the Administrative Code addresses the question whether a request for an extension may be filed after forty-five days:

(a) Time limits for filing an initial decision, filing exceptions and replies and issuing a final decision may be extended for good cause.

(b) A request for extension of any time period must be submitted no later than the day on which that time period is to expire. This requirement may be waived only in case of emergency or other unforeseeable circumstances.

[*N.J.A.C.* 1:1–18.8.]

If an agency seeks to avoid the application of the automatic approval provision by moving for an extension after forty-five days have elapsed, it must demonstrate "unforeseeable circumstances" under *N.J.A.C.* 1:1–18.8(b). We observe, however, that *N.J.A.C.*

---

Legislature's careful consideration of the effect of the judicial pay raise that was passed at the same time. *L.* 1981, *c.* 473.

1:1–1.3(b) permits "procedural rules [to] be relaxed or disregarded if the judge determines that adherence would result in unfairness or injustice."

■ We begin our analysis by restating our understanding of the automatic-approval provision's purpose:

The automatic-approval provision set forth in *N.J.S.A.* 52:14B–10(c) was intended to thwart undue delay in agency action. The provision is designed to encourage prompt consideration and disposition of contested cases. Timely resolution of such matters clearly serves the interests of the persons regulated by the agency, effectuates the agency's regulatory responsibilities, and advances the public interest in efficient and sound government.

[*King v. New Jersey Racing Comm'n*, 103 *N.J.* 412, 419, 511 *A.*2d 615 (1986).]

However, as we also recognized in *King*, although the OAL is possessed of significant authority in the actual conduct of hearings in contested cases on behalf of administrative agencies, the agency itself retains the exclusive right ultimately to decide those cases. *Id.* at 420, 511 *A.*2d 615; *In re Kallen*, 92 *N.J.* 14, 20, 455 *A.*2d 460 (1983) ("An agency head has the exclusive right to decide contested cases in administrative hearings."); *see In re Uniform Admin. Procedure Rules*, 90 *N.J.* 85, 94, 447 *A.*2d 151 (1982) (stating that while "the OAL may promulgate rules necessary to promote efficiency, uniformity and impartiality in the conduct of administrative hearings," it "may not adopt rules that nullify or frustrate the essential decisional authority of the agency itself and thereby undermine its ultimate regulatory responsibilities."); *cf. Unemployed–Employed Council v. Horn*, 85 *N.J.* 646, 650–58, 428 *A.*2d 1305 (1981) (explaining that although statute creating OAL intends to achieve impartiality in agency hearings, it also seeks to preserve agency jurisdiction and responsibility).

■ The teaching of *King* is that the twin goals of agency efficiency and agency responsibility "should inform a court as to the propriety of applying the deemed-approved provision of *N.J.S.A.* 52:14B–10(c)." *King, supra,* 103 *N.J.* at 421, 511 *A.*2d 615. In balancing those goals, we require an agency display of "bad faith," "inexcusable negligence," "gross indifference," or a complete failure to respond to an ALJ's Initial Decision within the

forty-five day period before that "decision should be transformed into the agency's final decision." *Ibid.*

Here, the Commission did not take any action in respect of the ALJ's Initial Decision until the forty-five day period had expired. Under our ruling in *King*, it would appear that the decision should have been deemed adopted pursuant to *N.J.S.A.* 52:14B–10(c). However, we are compelled to recognize that the Commission, as the body charged with the ultimate responsibility for determining cases related to the JRS, is a most unusual agency head. See *N.J.S.A.* 43:6A–29; *see also N.J.S.A.* 52:14B–2(d) (defining agency head as "the individual or group of individuals constituting the highest authority within any agency authorized or required by law to render an adjudication in a contested case"). For one thing, the Commission is composed of high-ranking officials from two branches of state government—the Governor, the State Treasurer, the Director of the Division of Budget and Accounting or their designees, and two members from each house of the Legislature appointed by the President of the Senate and the Speaker of the Assembly respectively. *N.J.S.A.* 52:20–1. Moreover, the Commission is required to meet only "once every three calendar months," *N.J.S.A.* 52:20–4, and rarely meets more frequently.[4] Most important, as pointed out by Chief Judge Masin, the Commission rarely appears before the OAL in a contested case.[5] It is

---

[4] The website for the Legislature listed on its calendar four Commission meetings in 2001, five in 2000, four in 1999, and three in 1998. The calendar can be accessed at http://www.njleg.state.nj.us/legislativepub/legcalen.asp.

[5] The State House Commission's primary responsibilities relate to its control of the sale and leasing of state-owned properties. *See, e.g., N.J.S.A.* 4:1C–48; *N.J.S.A.* 5:10–17; *N.J.S.A.* 13:1D–52; *N.J.S.A.* 13:8A–13, –31, –47, and –48; *N.J.S.A.* 13:18A–42 and 51; *N.J.S.A.* 23:8A–1; *N.J.S.A.* 27:6–1.1; *N.J.S.A.* 27:12B–21; *N.J.S.A.* 30:4–20 to –22; *N.J.S.A.* 30:4–177.29; *N.J.S.A.* 32:1–133.1; *N.J.S.A.* 38A:12–6; *N.J.S.A.* 52:20–13, –18.2, –18.5, –24; *N.J.S.A.* 52:31–1.6 to – 1.8. The Commission also must approve the retirement of state employees due to disability, *N.J.S.A.* 43:5–3, and the retirement of state employees who are eligible for noncontributory pensions. *N.J.S.A.* 43:5A–4. In respect of other legal disputes related to the Commission's duties, the Commission is authorized to

hardly surprising, then, that the Commission lacked appropriate procedures to assure a timely response to the ALJ decision.

In light of the unique nature of the State House Commission, its inaction regarding ALJ Springer's decision cannot be considered gross indifference or bad faith. The Commission took action immediately upon learning about the ALJ's initial decision, two and one-half weeks after the expiration of the forty-five day period. It would make little sense to apply the automatic-approval provision of *N.J.S.A.* 52:14B–10(c) on these facts simply for the sake of agency efficiency.

We do not find error in the OAL's grant of an extension to the Commission to respond to ALJ Springer's Initial Decision.

## IV

Turning now to the merits of the Commission's determination, we begin with the principle that "[c]ourts have only a limited role to play in reviewing the actions of other branches of government. In light of the executive function of administrative agencies, judicial capacity to review administrative actions is severely limited." *In re Musick, Dep't of Corrections,* 143 *N.J.* 206, 216, 670 *A.*2d 11 (1996). Our "[c]ourts generally 'give substantial deference to the interpretation an agency gives to a statute that the agency is charged with enforcing.'" *R & R Mktg., L.L.C. v. Brown–Forman Corp.,* 158 *N.J.* 170, 175, 729 *A.*2d 1 (1999) (quoting *Smith v. Director, Div. of Taxation,* 108 *N.J.* 19, 25, 527 *A.*2d 843 (1987)). Even when the language of the statute is ambiguous and

the Legislature has not addressed the precise question of statutory meaning, [we] may not simply impose [our] own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for

---

permit the State Highway Commission to settle or adjust any claim of the State against a county, municipality or corporation regarding obligations to contribute to the construction, maintenance, or repair of a State highway or bridge. *N.J.S.A.* 27:7–19.1.

> the court is whether the agency's answer is based on a permissible construction of the statute.
>
> To uphold an agency's construction of a statute that is silent or ambiguous with respect to the question at issue, a reviewing court need not conclude that the agency construction was the only one it permissibly could have adopted, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.
>
> [*Kasper v. Bd. of Trs. of the Teachers' Pension and Annuity Fund,* 164 *N.J.* 564, 581, 754 *A.*2d 525 (2000) (quoting 2 *Am.Jur.*2d *Admin. Law* § 525 (1994) (footnotes omitted)).]

In short, "we defer to '[t]he agency's interpretation ... provided it is not plainly unreasonable.'" *In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, Stranded Costs & Restructuring Filings,* 167 *N.J.* 377, 384, 771 *A.*2d 1163 (2001) (quoting *Merin v. Maglaki,* 126 *N.J.* 430, 437, 599 *A.*2d 1256 (1992)).

In this case, since the JRSA was amended in 1982, the Division has interpreted *N.J.S.A.* 43:6A–17 and –18 to require a one-time calculation of a survivor's benefits on the death of a sitting or retired judge. Stated another way, the Division's long-standing practice has been to base a survivor's benefit calculation on the judicial salary that was "current" (in place) at the time of death, and to fix future payments on that calculation.

Substantial deference to the Division's construction of the Act is particularly appropriate considering the Legislature's long-standing acceptance of that interpretation. Further, given the several plausible meanings the parties ascribe to it, the critical language—"current salary"—in the Act undoubtedly is ambiguous. Because our primary task in deciphering ambiguity in the language of a statute is to discern the intent of the Legislature, see *AMN, Inc. v. Township of S. Brunswick Rent Leveling Bd.,* 93 *N.J.* 518, 525, 461 *A.*2d 1138 (1983), the Legislature's apparent acquiescence in the Division's practice must be "granted great weight as evidence of its conformity with the legislative intent." *Malone v. Fender,* 80 *N.J.* 129, 137, 402 *A.*2d 240 (1979); see *Cedar Cove, Inc. v. Stanzione,* 122 *N.J.* 202, 212, 584 *A.*2d 784 (1991) ("The meaning ascribed to legislation by the administrative agency responsible for its implementation, including the agency's

contemporaneous construction, long usage, and practical interpretation, is persuasive evidence of the Legislature's understanding of its enactment."); *cf. Sherman v. Citibank (S.D.), N.A.,* 143 *N.J.* 35, 58, 668 *A.*2d 1036 (1995), *vacated on other grounds,* 517 *U.S.* 1241, 116 *S.Ct.* 2493, 135 *L.Ed.*2d 186 (1996) ("Courts have found consistency or lack thereof in an agency interpretation to be crucial in determining the degree of deference to be afforded that interpretation.").

Moreover, the Division's construction of the statutes is "not plainly unreasonable." *In re Pub. Serv. Elec. & Gas Co., supra,* 167 *N.J.* at 384, 771 *A.*2d 1163 (quoting *Merin, supra,* 126 *N.J.* at 437, 599 *A.*2d 1256). A plain reading of the Act in its entirety supports the Division's approach. We have determined that the phrase "current salary" in *N.J.S.A.* 43:6A–17 and –18 is ambiguous and susceptible to different interpretations. If unqualified, "current" usually refers to the present, elapsing time. However, "current" also is used to refer to a specific time, not the present, if qualified by a phrase or the context in which it is used. If we mention the current United States President, without qualifying "current," we are referring to George W. Bush. But if we discuss events that occurred during the Civil War in 1863 and we mention the current President, in that context we are referring to Abraham Lincoln.

▬▬▬▬ We therefore examine *N.J.S.A.* 43:6A–17 and –18 for the context in which the definition of "final salary" appears in order to discern the meaning of "current" within the Act.

In discharging our interpretive responsibility, we are admonished that "each part or section [of the statute] should be construed in connection with every other part or section so as to produce a harmonious whole," and that "it is not proper to confine interpretation to the one section to be construed."

[*In re Passaic County Utils. Auth.,* 164 *N.J.* 270, 300, 753 *A.*2d 661 (2000) (quoting Norman J. Singer, *Sutherland Statutory Construction* § 46.05 at 103 (5th ed.1992)).]

"[A] statute is to be interpreted in an integrated way without undue emphasis on any particular word or phrase and, if possible, in a manner which harmonizes all of its parts so as to do justice to

its overall meaning." *Chasin v. Montclair State Univ.*, 159 *N.J.* 418, 427, 732 *A.*2d 457 (1999) (quoting *Zimmerman v. Mun. Clerk of Township of Berkeley*, 201 *N.J.Super.* 363, 368, 493 *A.*2d 62 (App.Div.1985)).

The statutory language, taken as a whole, supports the Commission's ruling that survivorship benefits should be calculated once and fixed at that calculation. That interpretation of the Act is the simplest, most straightforward understanding of its plain language. *N.J.S.A.* 43:6A–17 and –18 provide: "Upon the receipt of proper proofs of death ... of a member of the retirement system, there shall be paid to his widow a survivor's benefit of 25% of final salary...." Accordingly, the Division calculates a survivorship benefit payment "[u]pon the receipt of proper proofs of death." *Id.* at –17 and –18. That legislative directive creates the context for the definition of "final salary" in sections 17 and 18: a member's final salary is the salary for judges serving in the same judicial position at the time when proper proofs of death are received by the Division.[6] If the judge dies in office, under section 17 the "current" salary is the same as his salary; if he dies after retirement, under section 18 the "current" salary is that of judges occupying the position at that time.

Notwithstanding the appellants' contrary position, *N.J.S.A.* 43:6A–13 is not inconsistent with the Commission's understanding of "current." Section 13 provides that payments to judges recalled for service after retirement cannot exceed in total (retirement allowance plus recall salary) the current salary of sitting judges. There, "current" is not used to establish either a judge's retirement benefit or survivorship benefits, but rather, the judge's

---

[6] ALJ Springer cited two out-of-state decisions that interpret the word "current," as used in similar statutes, to require a continual updating of retirement or survivorship benefits. See *Joseph v. Roebuck,* 672 *F.Supp.* 219 (D.C.V.I.1987); *Kozak v. Retirement Bd. of the Firemen's Annuity & Benefit Fund of Chicago,* 447 *N.E.*2d 394 (Ill.1983). However, the statutes in those cases do not create a context within which "current" refers to the point in time when proper proofs of death are submitted. Rather, in those statutes, the context suggests that "current" refers to the present time.

per diem salary at the time of recall. "Current," in context, describes "the salary of a justice or judge of the court from which he [or she] retired," *id.* at –13c, in contradistinction to the language in sections 17 and 18. See *id.* at –17 (referring to "the judicial position in which the member served at the time of death"); *id.* at –18 (referring to "the judicial position in which the member served at retirement").

We also find it significant that there is no language in the Act or in any available legislative history indicating that the Legislature intended any subsequent recalculation of survivorship benefits. As pointed out by the Commission, in the Pension Adjustment Act, *N.J.S.A.* 43:3B–1 to –10, the Legislature provided: "The monthly retirement allowance or pension originally granted to any retirant and the pension or survivorship benefit originally granted to any beneficiary shall be adjusted in accordance with the provisions of this act...." *N.J.S.A.* 43:3B–2. Had the Legislature intended "adjustments" under the JRSA, it would have so stated. It did not.

Appellants argue that the general definition of "final salary" in *N.J.S.A.* 43:6A–3g must be distinguished from the definition in sections 17 and 18 for the latter definition to have any meaning. We note that the "current salary" language was added to sections 17 and 18 as part of a package of bills that included a substantial (twenty-seven percent) increase for sitting judges.[7] It appears likely that the language "current salary" was meant to make it clear that a survivor's benefits were to be based on the new, higher salary even if a judge died on the day the new salary became effective. Indeed, a few months later the twenty-seven percent increase was made retroactive by nineteen days and there

---

[7] *N.J.S.A.* 43:6A–17 and –18 were amended to include the current definition of "final salary" by *L.* 1981, *c.* 470. The bill for that law provided that it would not become effective unless four other bills were passed. See *L.* 1981, *c.* 471 (increasing the Governor's salary); *L.* 1981, *c.* 472 (increasing State legislators' salaries, effective in 1984); *L.* 1981, *c.* 473 (increasing judicial salaries); and *L.* 1981, *c.* 474 (increasing cabinet salaries).

was a recalculation of benefits for affected members and their survivors. *L.* 1982, *c.* 22, § 1 (codified at *N.J.S.A.* 43:6A–3.1).

For all of those reasons, we hold that survivorship benefits under *N.J.S.A.* 43:6A–17 and –18 are properly calculated at the time of death of the JRS member based on the salary for the judicial position at that time.

## V

The final decision of the State House Commission is affirmed.

COLEMAN, J., dissenting.

I disagree with the Court's holding that although the State House Commission took no "action in respect of the ALJ's Initial Decision until the forty-five day period" mandated by *N.J.S.A.* 52:14B–10c had expired, the decision should not be deemed adopted pursuant to that statutory provision. *Ante* at 380, 802 *A.*2d at 503. There is neither statutory nor decisional law to support that holding. The statute contains no exception to its forty-five day requirement. *King v. New Jersey Racing Commission,* relied on by the Court, provides that the ALJ's decision should be deemed approved where the agency completely fails to respond to the Initial Decision within the forty-five days. *King, supra,* 103 *N.J.* at 421, 511 *A.*2d 615. Here, the agency completely failed to respond to the ALJ's decision for more than sixty days. I would hold that the ALJ's decision should be deemed approved by the Commission.

On the merits, I would reverse the final decision of the State House Commission for the reasons expressed by Administrative Law Judge Springer in his well-reasoned Initial Decision. After carefully examining the legislative history of *N.J.S.A.* 43:6A–17 and –18 of the Judicial Retirement System Act (Act) and pertinent legal precedents, he concluded that the plain language of the Act contemplates an escalator clause, thereby requiring recalculation of survivorship benefits to reflect increases in judicial salaries after a judge dies.

I fully subscribe to the following analysis and reasoning of Administrative Law Judge Springer.

Several rules of statutory construction strongly support petitioners' view of the statutory meaning. When interpreting any statute, the overriding goal is to ascertain the Legislature's intent. *Higgins v. Pascack Valley Hosp.*, 158 *N.J.* 404, 418, 730 *A.2d* 327 (1999). The analysis begins with the language of the statute. *State v. Kittrell*, 145 *N.J.* 112, 122–23, 678 *A.2d* 209 (1996). If the statute is clear, that language ordinarily governs. *Neptune Bd. of Educ. v. Neptune Educ. Ass'n*, 144 *N.J.* 16, 25, 675 *A.2d* 611 (1996). If the text, however, is susceptible to different interpretations, the court should consider extrinsic factors, such as the statute's purpose, legislative history, and statutory context, to ascertain the Legislature's intent. *State, Township of Pennsauken v. Schad*, 160 *N.J.* 156, 170, 733 *A.2d* 1159 (1999). Unwilling to rely on the general definition of final salary, the Legislature saw fit to adopt a unique definition for purposes of Sections 17 and 18 of the Act alone. Whenever the Legislature specifically defines a term, courts are bound by that definition. *Febbi v. Division of Employment Sec.*, 35 *N.J.* 601, 606, 174 *A.2d* 481 (1961); *accord Eagle Truck Transp., Inc. v. Board of Review*, 29 *N.J.* 280, 289, 148 *A.2d* 822 (1959).

Here the language of the statute appears clear and unambiguous on its face. Words will be given their ordinary and well-understood meaning, unless a contrary meaning is expressly indicated. *In re Barnert Mem. Hosp.*, 92 *N.J.* 31, 40, 455 *A.2d* 469 (1983); *Stevenson v. Keene Corp.*, 254 *N.J.Super.* 310, 317–18, 603 *A.2d* 521 (App.Div.1992). "Current" [salary, as used in subsection 17(c),] conveys the sense of periodic change or updating to keep abreast of modern trends. *Webster's New International Dictionary* 557 (3d ed.1976) defines "current" in terms of "flowing easily and smoothly; presently elapsing; occurring in or belonging to the present time." Use of such word implies that the Legislature did not intend survivors' benefits to remain static, but to adjust with changes in judicial salaries.

Insertion of the adjective "current" next to "salary" indicates that salaries are not to be fixed at date of death. Otherwise it would have been unnecessary to add the extra word. Legislative language must not, if reasonably avoidable, be found to be inoperative, superfluous or meaningless. *Franklin Tower One, L.L.C. v. N.M.*, 157 *N.J.* 602, 613, 725 *A.2d* 1104 (1999). Each word in a statute should be given effect, and it should not be assumed that the Legislature employed meaningless language. *Verniero v. Beverly Hills, Ltd.*, 316 *N.J.Super.* 121, 127, 719 *A.2d* 713 (App.Div.1998).

Moreover, it is an established rule of construction that words of relation presumptively refer to the nearest antecedent. *State ex rel. S.Z.*, 177 *N.J.Super.* 32, 35, 424 *A.2d* 855 (App.Div.1981). Qualifying phrases refer solely to the last antecedent, unless a contrary intention appears. *State v. Congdon*, 76 *N.J.Super.* 493, 502, 185 *A.2d* 21 (App.Div.1962). Since the phrase "at the time of death" in Section 17 is located nearer to "judicial position" than to "current salary," it qualifies the former rather than the latter. The same relationship exists for the phrase "at retirement" in Section 18. Thus, final salary is measured by the amount of salary received by persons presently holding the last judicial position in which the member served at time of death or retirement.

Further, the Division contends that treating "final salary" as a variable amount would contradict other parts of Section 17 by subjecting life insurance benefits to continuous supplementation. Subsection (b) provides that, in addition to the periodic survivor's benefit, "there shall also be paid in *one sum* to the member's beneficiary an amount equal to one and one-half times the final salary *received by the member*." (Emphasis added). Since the special definition of "final salary" in subsection (c) applies to the entire section, the Division worries that life insurance "would also be subject to continuous adjustment." Such fears, however, are unwarranted. Read in context, life insurance is a one-time payment tied directly to the final salary "received by the member." It so happens that the salary of a judge who dies in active service is equivalent to the current salary payable to his judicial colleagues (unlike a retired judge who no longer participates in salary increases). The issue of future adjustment simply never arises, since subsection (b) calls for a single lump-sum payment.

Ordinarily, the language of the statute is the surest indicator of the Legislature's intent. *Alan J. Cornblatt, P.A. v. Barow*, 153 *N.J.* 218, 231, 708 *A.2d* 401 (1998). Where a statute is clear and unambiguous, the court "need delve no deeper than the act's literal terms to divine the Legislature's intent." *State v. Butler*, 89 *N.J.* 220, 226, 445 *A.2d* 399 (1982); *Gallo v. Sphere Constr. Corp.*, 293 *N.J.Super.* 558, 562–63, 681 *A.2d* 1237 (Ch.Div.1996). If the language plainly and clearly reveals the statute's meaning, the court's sole function is to enforce the statute as written. *Bunk v. Port Auth. of N.Y. & N.J.*, 144 *N.J.* 176, 194, 676 *A.2d* 118 (1996).

Given the plain language of Sections 17 and 18, there is no need to resort to extrinsic aids in order to ascertain legislative intent. Clearly, the Legislature intended survivors' benefits to be based on "current" judicial salary levels.

Cases from sister jurisdictions have made similar interpretations of comparable language in their statutes. In *Joseph v. Roebuck*, 672 *F.Supp.* 219 (D.C.V.I.1987), for example, a federal district court interpreted the term "current salary" as used in a judicial pension statute to create an "escalator clause," requiring a retired judge's salary to be calculated upon the present salary of territorial court judges. There too, the government unsuccessfully argued that the retiree's pension ought to be based on the salary that he had earned when he left the bench.

Likewise, in *Kozak v. Retirement Bd. of the Firemen's Annuity & Benefit Fund of Chicago*, [447 *N.E.2d* 394 (Ill.1983),] the Supreme Court of Illinois held that the words "current annual salary" in a pension law benefiting spouses of firefighters killed in the line of duty meant that the annuity would increase with changes in fire department salaries from time to time. Rejecting the retirement board's objection that such outcome would necessitate a doubling of the fund's reserves, the [c]ourt assumed that the Legislature "was cognizant of the increased expense of the type of open-ended and fluctuating public pension benefit it was adopting." [*Id.* at 398.] Accordingly, the [c]ourt found that such additional expense "does not justify our attempting to rewrite the statute." [*Ibid.*]

Although the Division attempts to distinguish the Virgin Islands and Illinois cases on the basis that New Jersey has a separate mechanism for dealing with inflationary pressures, the risk of inflation was only one of many factors considered

by the courts. The rationale of both these holdings is that the plain language of the statutes dictated the result.

Even if one examines extrinsic aids as a guide to legislative intent, such exercise only strengthens petitioners' argument. Unfortunately, the legislative history, comprised of a terse sponsor's statement attached to Senate Bill No. 536, a statement of the Senate Judiciary Committee and a press release by the Office of Governor Byrne, does not provide any useful insight into these particular sections of the Act. As a general proposition, pension laws are regarded as remedial social legislation and "must be liberally construed in favor of the persons intended to be benefited thereby." *Bumfaco* proposition, pension laws are regarded as remedial social legislation and "must be liberally construed in favor of the persons intended to be benefited thereby." *Bumbaco v. Board of Trustees of the Public Employees' Retirement Sys.*, 325 *N.J.Super.* 90, 94, 737 *A.2d* 1147 (App.Div.1999)[, *certif. denied*, 163 *N.J.* 75, 747 *A.2d* 283 (2000) ]. Therefore, any ambiguities inherent in the statutory language would normally be construed in favor of the beneficiaries whom the Act was designed to protect.

Nonetheless, the Division maintains that the Act must be read together with the Pension Adjustment Act, *N.J.S.A.* 43:3B–1 to –10, to gain a fuller understanding of its purpose and effect. Statutes should be considered in light of other statutory provisions and the nature of the subject matter. *G.S. v. Department of Human Servs.*, 157 *N.J.* 161, 172, 723 *A.2d* 612 (1999). Applicable generally to all public retirement systems "administered by the Division," *N.J.S.A.* 43:3B–1, the adjustment provisions are designed to protect pension and survivorship benefits against being eroded by inflation. The Pension Adjustment Act achieves this purpose by providing for an annual adjustment or cost-of-living allowance at the rate of 60% of the change in the consumer price index from its level in the year of a member's retirement or death. *N.J.S.A.* 43:3B–7.

Contrasted with an increase of 100% of the rate of change in judicial salaries that survivors would receive under the statutory interpretation advocated by petitioners, the Division emphasizes the unfairness of giving survivors in other retirement systems only 60% of the rate of change in the consumer price index. Nothing in Sections 17 and 18 of the Act, however, is inconsistent with the provisions of the general pension adjustment legislation. Although the Division utilizes common practices to promote uniform and economical administration of all state retirement systems, the substantive benefits available under the various systems are not necessarily equal.

Retirement benefits under the JRS are in many respects more generous than those offered under other state retirement systems, such as the Public Employees' Retirement System ("PERS"), *N.J.S.A.* 43:15A–1 to 141. *See, e.g.,* the rate of employee contributions (3% of salary for newly enrolled members under the JRS, *N.J.S.A.* 43:6A–34.1(b), compared to 5% of salary for newly enrolled members under the PERS, *N.J.S.A.* 43:15A–25.) *See also,* the formula for calculating pension benefits (75% of final salary for members with ten years of service under the JRS, *N.J.S.A.* 43:6A–8, compared to 16.66% of final salary for members with ten years of service under the PERS, *N.J.S.A.* 43:15A–48(b)).

Moreover, as the Division points out, the Pension Adjustment Act contemplates that survivorship benefits may be subject to blanket increases resulting from future legislative measures, such as judicial salary increases. When there is a legislated blanket increase, *N.J.S.A.* 43:3B–8 provides that the cost-of-living allowance will not be payable until the original benefit plus cost-of-living increases will exceed the new benefit granted by such other legislation. The Legislature intended that surviving dependents of judges receive either the blanket increase or the cost-of-living allowance—whichever is greater—but not both. Hence, the two related statutory schemes can be read harmoniously to supplement each other.

[Footnotes omitted.]

For all of the foregoing reasons, I would reverse the decision of the State House Commission.

*For affirmance*—Chief Justice PORITZ, and Justices STEIN, LONG, VERNIERO, and ZAZZALI—5.

*For reversal*—Justice COLEMAN—1.