866 A.2d 235 (2005)
375 N.J. Super. 12
In the Matter of Alleged Non-Compliance by RCN OF NY, a Wholly-Owned Subsidiary of RCN Corporation, with the Requirements of N.J.S.A. 48:5A-15, 16, 17 and 22 Requiring Municipal Consent from the City of Jersey City Environmental Protection and a Certificate of Approval from the Board for Newport Community in Jersey City, New Jersey.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 2004.
Decided February 9, 2005.
*236 Robert G. Goode, argued the cause for appellant RCN Telecom Services, Inc. (Arturi, D'Argenio & Guaglardi, attorneys, Englelwood Cliffs; Mr. Goode, on the brief).
Kenneth J. Sheehan, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (Peter C. Harvey, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Mr. Sheehan, on the brief).
Before Judges WEFING, FALL and C.S. FISHER.
The opinion of the court was delivered by
WEFING, P.J.A.D.
RCN Telecom Services, Inc. ("RCN") appeals from a Final Order of the New Jersey Board of Public Utilities ("BPU") in which the BPU concluded that RCN should be classified as a cable system under 47 U.S.C.A. § 522(7) and, as a consequence, subject to the BPU's jurisdiction. After reviewing the record in light of the contentions advanced on appeal, we are satisfied that the BPU erred in reaching this conclusion and, accordingly, we reverse.
Although the lay public may speak generally of watching "cable TV," there are different technologies by which television signals are transmitted to the viewing public. Those technological differences are legally significant because they generate different legal consequences. In this appeal, we are called upon to consider alternate and competing methods of supplying video programming and whether the methodology utilized by RCN "uses a public right of way." RCN contends that it does not make use of public right-of-way but the BPU reached the opposite conclusion. Analyzing and resolving that issue will determine whether a satellite master antenna television system (referred to generally by the acronym "SMATV") maintained and operated by RCN also constitutes a "cable system."
Congress has defined a cable system in 47 U.S.C.A. § 522 as a

*237 facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community....
The statute continues, however, to exclude from that encompassing definition "a facility that serves subscribers without using any public right-of-way...." 47 U.S.C.A. § 522(7)(B).
In the most basic terms, "cable television is a one-way, point-to-point telecommunication system. Cable operators send a signal to individual subscribers' homes through a coaxial cable or fiber optic line." Michael W. Maseth, Comment, The Erosion of First Amendment Protections of Speech and Press: The "Must Carry" Provisions of the 1992 Cable Act, 24 Cap. U.L. Rev. 423, 424 (1995).
A SMATV system also transmits video programming to its customers, but it utilizes a combination of wiring, antennae and satellites to do so. "[A]n SMATV system typically receives a signal from a satellite through a small satellite dish located on a rooftop and then retransmits the signal by wire to units within a building or complex of buildings." FCC v. Beach Communications, 508 U.S. 307, 311, 113 S.Ct. 2096, 2100, 124 L.Ed.2d 211, 220 (1993). See also In Matter of Earth Satellite Communications, Inc., 95 F.C.C.2d 1223 (1983), aff'd sub nom. New York State Comm'n on Cable Television v. FCC, 749 F.2d 804 (D.C.Cir.1984) (describing a SMATV system as "consist[ing] of a receive-only satellite earth station that provides premium programming signals transmitted to the receive station via satellite and a master antenna for the receipt of over-the-air television broadcast signals. These signals are combined and distributed through cable to subscribers residing in the multi-unit dwellings."); Andrew D. Ketter, Comment, The Narrow Choice of Broadband Providers for Consumers: Competition and Local Regulation, 2002 Wis. L. Rev. 211, 218 (2002).
RCN utilizes SMATV technology to provide video programming to the Newport complex in Jersey City which was laid out and developed by a private developer, Newport Associates Development Company, ("NADC"). NADC included SMATV technology from the outset in its original plan for the project as the method by which the residents of Newport would receive cable video programming. At the time the present dispute arose, Newport consisted of ten buildings with more than two thousand residential units. RCN is the successor to the original supplier of video programming to the Newport residents.
RCN collects a satellite signal at a site located in New York which it then sends via microwave transmission to an antenna centrally located within Newport. That video signal is then distributed among the Newport buildings by way of coaxial cable. Those cables pass under two roadways, River Drive South and Newport Parkway, to provide video programming to the entire complex.
When NADC originally developed Newport, the roadways within the complex were not public thoroughfares but were owned by NADC. The coaxial cables used to distribute the SMATV signal among the Newport buildings were buried under these two private roads. Because RCN's SMATV system did not use a public right-of-way, it was excluded from the definition of a "cable system" contained in 47 U.S.C.A. § 522(7).
Eventually, for reasons unrelated to this appeal, NADC determined to dedicate River Drive South and Newport Parkway as public streets. After a period of review *238 and consideration, Jersey City accepted these two roads as public streets and passed appropriate ordinances. Jersey City accepted Newport Parkway in 1991 and River Drive South in 1993.
At the time the present dispute arose, RCN was the sole supplier of video programming to the residents of Newport. The City of Jersey City has, by contrast, given a franchise to Comcast Cablevision of Jersey City to provide cable television service throughout the balance of the City. Comcast's system involves transmitting video programming signals along a system of cables and wires that do use the public streets. Comcast is thus a cable system within the meaning of 47 U.S.C.A. § 522(7).
Having received its franchise from Jersey City, Comcast, in turn, filed a petition with the BPU to obtain access to Newport and solicit customers for its cable system among the Newport residents. RCN and NADC opposed Comcast's petition. We are informed that the BPU ultimately granted that petition, a decision that is being challenged on appeal to this court. The merits of that appeal, however, are not before us.
The BPU determined that because RCN's cables ran under what were by then public roads, RCN was "using" a public right-of-way, thus transforming it from a private cable system not subject to the BPU's jurisdiction, to a cable television system subject to the BPU's jurisdiction. The order entered by the BPU directed RCN to seek approval from Jersey City to operate its system and to file a petition for a certificate of approval with the BPU. It is that order which is now before us on appeal.
Pursuant to the New Jersey Cable Television Act, N.J.S.A. 48:5A-1 to -64, the BPU has the general authority to regulate cable television companies in this State. N.J.S.A. 48:5A-2(d). Although the BPU is granted broad powers under this statute, its jurisdiction and authority are limited in scope and application by federal statutes and regulations. 47 U.S.C.A. § 521; N.J.S.A. 48:5A-1 to -64. The BPU cannot regulate what Congress has exempted. The answer to the question before us is thus contained in 47 U.S.C.A. § 522(7)(B).
The parties' research, and our own, has uncovered only two reported opinions which have directly addressed, in somewhat analogous circumstances, what it means to use a public right-of-way under 47 U.S.C.A. § 522(7)(B). Those opinions have, however, reached different conclusions. RCN relies on a decision from the Court of Appeals for the Eighth Circuit, Guidry Cablevision/Simul Vision Cable System v. City of Ballwin, 117 F.3d 383 (8th Cir.1997), while the BPU relies on an opinion of the Iowa Supreme Court, Mason City v. City Center of Mason City, Inc., 634 N.W.2d 667 (Iowa 2001).
The question before the court in Guidry was whether a SMATV system, which used cables that crossed under a public street, was using a public right-of-way. Guidry, supra, 117 F.3d at 384. In that case, Guidry Cable entered a contract in 1984 with Seven Trails West to provide SMATV service to an apartment complex owned by Seven Trails; the complex consisted of several commonly-owned multiple-unit buildings. Ibid. To operate this system and to provide service to all of the apartments within the complex, Guidry Cable had to install transmission lines that crossed under Seven Trails Drive. Ibid. This road had been dedicated and accepted as a public road several years prior to the contract between Guidry Cable and Seven Trails. Ibid. Guidry Cable applied for and received from the City of Ballwin an excavation permit, allowing it to install its cables *239 under the roadway. Ibid. The contract between Guidry Cable and Seven Trails was executed some years before Congressional passage of the Cable Communications Policy Act of 1984, 47 U.S.C.A. § 521 to § 615b, and its definition of a "cable system." Guidry Cable had, therefore, applied initially to Ballwin for a franchise to operate its SMATV system, and Ballwin had approved its application. Ibid.
In 1986, after passage of the act, Guidry Cable stopped paying its franchise fees to Ballwin, contending that its SMATV system was not a cable system and, thus, it was not required to obtain a franchise from the city to operate. Guidry, supra, 117 F.3d at 384. It commenced a declaratory judgment action seeking relief, and Ballwin counterclaimed for the balance it alleged was due and owing as unpaid franchise fees. Ibid.
The court framed the issue before it as being whether Guidry Cable, by having its cable line buried under Seven Trails Drive to connect several buildings within the Seven Trails West complex, had used a public right-of-way. Ibid. In considering the question, it noted that the United States Supreme Court had explained that the word "use" can have different meanings in different contexts.
In Bailey, the Supreme Court explained that "the word `use' poses some interpretational difficulties because of the different meanings attributable to it." The word "draws meaning from its context," and a court must consider "not only the bare meaning of the word but also its placement and purpose in the statutory scheme." Therefore, "use" in § 522(7)(B) must be construed in the context of the Cable Act and the F.C.C.'s prior regulation of the cable television industry.
[Guidry, supra, 117 F.3d at 385 (quoting Bailey v. United States, 516 U.S. 137, 143, 145, 116 S.Ct. 501, 505, 133 L.Ed.2d 472, 480 (1995)).]
The court then turned to the nature of a private cable system, as opposed to a cable system within the parameters of § 522(7). Id. at 386. It noted that traditional cable systems often place their cable lines under the streets and thoroughfares of an entire municipality and thus make extensive use of public rights-of-way. Id. at 385. Doing so, the court pointed out, permits a cable system to lay its cables in an efficient and practical manner, without the necessity of negotiating multiple easements with a number of private owners. Ibid.
This active interaction between cable operators and local governments is also the reason for the F.C.C.'s long-standing tolerance of local cable franchising. "The dual federal-local jurisdictional approach to regulating cable systems is largely premised on the fact that cable systems necessarily involve extensive physical facilities and substantial construction upon and use of public rights-of-way in the communities they serve." [Ibid. (quoting In re Definition of a Cable Television System, 5 F.C.C.R. 7638, 7639 (1990)).]
Turning to the matter before it, the court noted that Guidry Cable's "involvement with the City's public right-of-way [was] far less substantial." Ibid. Rather than Seven Trails Drive serving as a route or conduit to ease its path, the roadway had proved to be "an obstacle that must be overcome." Ibid.
The court also considered the nature of the cable television industry. Guidry, supra, 117 F.3d at 386. It pointed out, for instance, that subjecting a cable company to the franchising authority of a municipality may protect individual consumers from the power a cable company may enjoy *240 once it is in operation. Ibid. Such protection is not as necessary for the residents of a multi-unit building served by a SMATV system whose "owner has countervailing bargaining power because it represents numerous potential subscribers." Ibid.
The court also pointed out that the F.C.C. had "adopted a policy of allowing competition to regulate the development of SMATV so as to encourage the development of satellite transmission of television programming." Ibid. In the court's judgment, subjecting Guidry Cable to the franchising jurisdiction of Ballwin would run counter to that policy. Ibid. It thus concluded that, both in a practical sense and in terms of the statute's purpose, Guidry Cable did not "use" a public right-of-way when it placed its cable underneath the roadway of Seven Trails Drive. Ibid.
The cable lines in question in Mason City, supra, were not buried beneath the road but crossed over the street. Defendant City Center owned an apartment building in Mason City that did not receive cable television service from the company to which Mason City had granted a franchise. 634 N.W.2d at 668-69. To provide cable television to its tenants, City Center installed a satellite dish on the roof of its building but, to defray the cost of this work, negotiated an agreement to provide cable television service to the residents of another apartment building several blocks away. Ibid. It then negotiated easements with the owners of several other buildings along the way to attach its cable lines to those buildings. Id. at 669. These easements did not obviate the need to cross three public streets in order to link video programming service between the two apartment buildings. Ibid. The court noted that "the cable lines from the satellite dish to the [second building] crossed over city streets [but] the lines were not attached to city property and, in fact, did not touch any city property." Ibid. The city then issued a citation to City Center for operating a cable system without first having received a franchise from the City. Ibid. City Center was first found to have violated the city's ordinance, a decision that was initially overturned on appeal. Mason City, supra, 634 N.W.2d at 669. Mason City then sought relief before the Iowa Supreme Court. Ibid.
That court rejected the approach adopted by the Eighth Circuit in Guidry and concluded that City Center, by passing its cables over the streets, had used a public right-of-way and was thus a cable system for regulatory and jurisdictional purposes. Id. at 674. The Iowa Supreme Court relied upon portions of the F.C.C.'s regulatory statement, In re Definition of a Cable Television System, supra, during the course of which the F.C.C. did indicate that crossing a public right-of-way constituted a "use" of that right-of-way and that an SMATV system otherwise exempt from F.C.C. jurisdiction would lose that exemption if it connected units within its system by cables which crossed a public right-of-way. Id. at 671-73. The Iowa Supreme Court considered the F.C.C.'s statement more persuasive authority than what it referred to as the Eighth Circuit's "turn[ing] to criminal cases interpreting `uses' in the context of criminal statutes." Id. at 671, n. 2.
The BPU urges us, on this appeal, to adopt the approach of the Iowa Supreme Court and affirm its order. We decline to do so for several reasons.
We note at the outset that we reject the BPU's assertion that its statutory interpretation is entitled to deference, a principle recognized in cases such as Matturri v. Bd. of Trustees of Judicial Retirement Sys., 173 N.J. 368, 382, 802 A.2d 496, 504-05 (2002). That principle is applicable in instances involving the "statute that the *241 agency is charged with enforcing." Id. at 381, 802 A.2d at 504 (quoting R & R Mktg., L.L.C. v. Brown-Forman Corp., 158 N.J. 170, 175, 729 A.2d 1, 4 (1999)). Here, however, we are faced with interpreting a federal statute. The question before us is one of law, and we review the BPU's decision de novo. Greenwood v. State Police Training Center, 127 N.J. 500, 513, 606 A.2d 336, 342 (1992) (noting that "[a]gencies ... have no superior ability to resolve purely legal questions and ... a court is not bound by an agency's determination of a legal issue ...").
We do not share the views of the Iowa Supreme Court and the BPU that the Guidry court's opinion should be rejected because it looked to criminal cases to analyze the meaning of the term "use." Having studied the Guidry opinion in detail, we consider it apparent that it cited to Bailey v. United States, supra, not to determine the meaning of "use" but merely because the Court's opinion in that case concisely summarized the constructional process facing any court called upon to determine the meaning of a statute. The views expressed by the United States Supreme Court in Bailey in this regard are echoed by New Jersey courts, Jimenez v. Baglieri, 152 N.J. 337, 346-47, 704 A.2d 1285, 1290 (1998) (stating "[i]n the absence of specific guidance, our task is to discern the intent of the Legislature not only from the terms of the Act, but also from its structure, history and purpose"); Parker v. Esposito, 291 N.J.Super. 560, 566, 677 A.2d 1159, 1162 (App.Div.1996) (noting that the "[s]ources of legislative intent are the language of the statute, the policy behind the statute, concepts of reasonableness and legislative history").
Further, in our judgment, the Eighth Circuit conducted a detailed examination not just of the statutory language but of the underlying purposes of federal and local regulation of cable television service. It did not reach its conclusion in a vacuum but, rather, considered the entire context of the industry, as well as the particulars of the matter before it.
We do not consider it sufficient merely to rely on certain dicta contained within the F.C.C.'s declaration in In re Definition of a Cable Television System, supra, to answer the question before us. In that regulatory statement, the F.C.C. was not attempting to answer the question which confronts this court, nor did it give reasons to support its assertion that crossing a public right-of-way constitutes a use of that right-of-way.
We consider it significant that the congressional purpose has consistently been to encourage the spread of cable television service through competition.
Congress set forth a national framework to increase competition when it passed the Cable Communications Policy Act in 1984 and explicitly broke up exclusive franchising when it passed the Cable Television Consumer Protection and Competition Act of 1992. Moreover, Congress reaffirmed its commitment to increasing the competition in and deregulation of the communications industry when it passed the Telecommunications Act of 1996.
[Ketter, supra, 2002 Wis. L. Rev. at 212.]
The F.C.C. recognized this preference for competition in its 1983 ruling and order in In the Matter of Earth Satellite Communications, Inc., supra, when it ruled that New Jersey could not order a SMATV system to obtain a state certificate of approval as a condition of operation. In the course of its ruling, the Commission stated:
The avoidance of barriers to satellite reception ... caused by state or local licensing or economic regulation of earth *242 station receivers is a matter that will be of growing importance as the cost of the equipment used for television, data, or other communications service reception declines. The Commission has pursued open entry policies in the satellite field for the purpose of creating a more diverse and competitive telecommunications environment. The authorization of competitive facilities, ... demonstrate the Commission's implementation of these policies. The interposition of prior approval requirements at the state or local level contradicts our efforts to create a more rapid and efficient interstate telecommunications marketplace.
[Earth Satellite, supra, 95 F.C.C.2d 1223 at 1231-32.]
The Congressional commitment to a lessening of the regulatory scope of administrative bodies is seen in the Telecommunications Act of 1996, which among its numerous provisions, amended the extent of § 522(7)(B). At the time of the Guidry decision, there were two required elements a cable television service had to meet in order to qualify for the statute's private cable exemption. The statute originally excluded from the definition of a cable system "a facility that serve[d] only subscribers in 1 or more multiple unit dwellings under common ownership, control or management, unless such a facility or facilities use[d] any public right-of-way." Guidry, supra, 117 F.3d at 385. When Congress passed the 1996 act, it deleted the requirement of common ownership, control or management, thus creating the possibility of a larger number of private, exempt cable services. This is wholly consistent with the bill's stated purpose to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunication consumers and encourage the rapid development of new telecommunications technologies." Telecommunications Act of 1996, Pub. L. No. 104-104, 100 Stat. 56.
We deem it contrary to this legislative intent to conclude that RCN is subject to the regulatory jurisdiction of the BPU as a result of an action taken years after it commenced operation, an action, moreover, to which it was not a party. The order under review is reversed.