892 A.2d 636

IN THE MATTER OF ALLEGED NON-COMPLIANCE BY RCN OF NY, A WHOLLY-OWNED SUBSIDIARY OF RCN CORPORATION, WITH THE REQUIREMENTS OF N.J.S.A. 48:5A-15, 16, 17, AND 22 REQUIRING MUNICIPAL CONSENT FROM THE CITY OF JERSEY CITY AND A CERTIFICATE OF APPROVAL FROM THE BOARD FOR NEWPORT COMMUNITY IN JERSEY CITY, NEW JERSEY.

Argued November 30, 2005—Decided March 1, 2006.

*Kenneth J. Sheehan,* Deputy Attorney General, argued the cause for appellant, New Jersey Board of Public Utilities (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

*Robert G. Goode* argued the cause for respondent, RCN Telecom Services, Inc., incorrectly plead as RCN of N.Y. (*Arturi, D'Argenio & Guaglardi,* attorneys).

Justice ZAZZALI delivered the opinion of the Court.

RCN of New York (RCN) operates a satellite master antenna system (SMATV) in the Newport Building Complex in Jersey City, providing cable programming to Newport's residents. The SMATV facility functions by receiving a microwave signal at a centrally located antenna in Newport and re-transmitting that signal to Newport's buildings through wires that run underneath public roads.

The Board of Public Utilities (BPU), the body that regulates utilities in the State of New Jersey, claims that the Cable Communications Policy Act of 1984, 47 *U.S.C.* §§ 521 to 573 (Federal Cable Act), authorizes the BPU to regulate RCN. The BPU argues that RCN is subject to regulation because RCN's SMATV facility is "using any public right-of-way" under § 522(7)(B) of the Federal Cable Act and therefore qualifies as a "cable system." Pursuant to the private cable exemption in § 522(7)(B), cable facilities that do not "use" public rights-of-way are exempt from

the dual, federal-state regulatory scheme created by the Federal Cable Act, which vests both the Federal Communications Commission (FCC) and state-run local authorities such as the BPU with powers to enforce its provisions. RCN agrees that its wires cross underneath Newport's public rights-of-way but disputes the BPU's determination that it "uses" those roads within the meaning of the Federal Cable Act.

This matter thus requires the Court to interpret the meaning of the phrase "using any public right-of-way." § 522(7)(B). The agency charged with the statute's administration, the FCC, has determined that when closed transmission paths such as wires or cables cross public rights-of-way, they "use" those rights-of-way. Because that interpretation is reasonable, we are bound under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 *U.S.* 837, 104 *S.Ct.* 2778, 81 *L.Ed.*2d 694 (1984), to defer to the FCC and hold that RCN is subject to BPU regulation.

I.

As described by the Appellate Division, the Newport Associates Development Company (Newport Associates) developed the Newport Building Complex in Jersey City. A SMATV system was designed for the original project plan for the complex and has provided cable programming to Newport residents since 1987. The SMATV system functions by receiving a video signal at a centrally located antenna in Newport from microwave signals originating in New York. The video programming then is distributed through coaxial cables to the remaining buildings in the complex. When this conflict began in 2003, the complex consisted of ten buildings with 443 condominium units and 3104 rental units.

RCN, a provider of cable programming and respondent in this appeal, represents that in 1996 it contracted with Newport Associates to assume operation of Newport's SMATV services, purchasing the interests of a previous cable provider. RCN's cables run underneath two streets in Newport: River Drive South and Newport Parkway. At the time that the Newport complex was

built and the cables originally installed, Newport Associates owned those streets. The streets became public, however, when Newport Associates dedicated them to Jersey City in 1991 and 1993.

In 2003, the BPU sent an order to RCN stating that RCN's SMATV system is a "cable system" under § 522(7)(B) of the Federal Cable Act. The BPU directed RCN to comply with the requirements of the New Jersey Cable Television Act by filing for a certificate of approval, *N.J.S.A.* 48:5A–17(a), and filing for municipal consent from Jersey City, *N.J.S.A.* 48:5A–22. RCN responded with a letter disagreeing with the BPU's determination that the BPU has the authority to regulate RCN and requesting that the BPU dismiss its order. RCN conceded that its cables cross underneath River Drive South and Newport Parkway but stated that those cables do not "use" a public right-of-way within the meaning of the Federal Cable Act. The BPU then issued a final order in which it stated that RCN's running of two coaxial cables under a public road is "a sufficient use of the public right-of-way to qualify RCN as a cable system under 47 *U.S.C.A.* § 522(7)." RCN requested reconsideration of the order, the BPU denied that request, and RCN appealed to the Appellate Division.

The Appellate Division reversed the BPU and held that RCN's SMATV system is not a "cable system" under § 522(7)(B). *In re Alleged Non-Compliance by RCN of NY*, 375 *N.J.Super.* 12, 14, 866 *A.2d* 235 (App.Div.2005). The court reasoned that the term "use" must be interpreted in light of congressional intent to encourage the spread of cable television by limiting regulation. *Id.* at 22–23, 866 *A.2d* 235. The panel found that it would be contrary to such intent to "conclude that RCN is subject to the regulatory jurisdiction of the BPU as a result of an action taken years after it commenced operation, an action, moreover, to which it was not a party." *Id.* at 23, 866 *A.2d* 235. The BPU appealed, and we granted certification. 183 *N.J.* 592, 874 *A.2d* 1109 (2005).

II.

At oral argument, RCN declared its intent to cease operation of its Newport SMATV system sometime during December of

2005. Despite that declaration, both parties informed the Court that they do not consider the matter moot and requested that we proceed with a decision on the merits. Because the question presented is one of public importance, *In re J.I.S. Industrial Service Co. Landfill*, 110 *N.J.* 101, 104, 539 *A.*2d 1197 (1988), we turn to the merits.

To understand and interpret the statutory term in question, we first set forth a discussion of the cable industry's regulatory history and the policies underlying the Federal Cable Act. We next determine whether RCN's wires "us[e] any public right-of-way" within the meaning of § 522(7)(B). Because we find that the statute is ambiguous, we then examine agency interpretation of the provision. Finally, we consider whether we are required to defer to that interpretation.

### III.

Since the development of cable television in the 1950s, a web of state, federal, and agency actors has regulated the industry. States first began regulating cable companies in exchange for permission to excavate and intrude on public rights-of-way with the companies' wires and facilities. *Options for Cable Legislation: Hearings on H.R. 4103, H.R. 4229 & H.R. 4299 Before the Subcomm. on Telecomm., Consumer Prot., and Fin. of the H. Comm. on Energy & Commerce*, 98th Cong. 28 (1983) (statement of Thomas E. Wheeler). Although it lacked express congressional authority to do so, the FCC also stepped into the regulatory foray of cable television in the 1960s, making rules and issuing regulations. *See United States v. Sw. Cable Co.*, 392 *U.S.* 157, 164–67, 88 *S.Ct.* 1994, 1998–2000, 20 *L.Ed.*2d 1001, 1008–10 (1968) (detailing genesis of FCC regulation of cable industry); Joseph R. Fogarty & Marcia Spielholz, *FCC Cable Jurisdiction: From Zero to Plenary in Twenty-Five Years*, 37 *Fed. Comm. L.J.* 113 (1985) (same).

The FCC laid the foundation for the current dual, state-federal regulatory scheme when it preempted state regulation of operational aspects of cable systems, such as channel regulations, but

preserved local control of the non-operational aspects of the cable industry, such as franchisee selection and maintenance of rights-of-way. *Duplicative & Excessive Over–Regulation of Cable Television*, 54 *F.C.C.*2d 855, 863, 1975 *WL* 30644 (1975). In *Cable Television Report and Order*, the FCC explained its rationale for such a "creative federalis[t]" approach:

[C]onventional [federal] licensing would place an unmanageable burden on the Commission. Moreover, *local governments are inescapably involved in the process because cable makes use of streets and ways and because local authorities are able to bring a special expertness to such matters*, for example, as how best to parcel large urban areas into cable districts. Local authorities are also in better position [sic] to follow up on service complaints.

[36 *F.C.C.*2d 143, 207, 1972 *WL* 26659 (1972) (emphasis added).]

Despite growing federal and state regulatory involvement in the cable industry, the FCC established exceptions that exempt certain cable providers from regulation. Relevant to this appeal is the FCC's 1983 declaratory judgment exempting from state and local regulation those SMATV systems that receive wireless signals into antennas stationed on *private* property. *In re Earth Satellite Communc'ns, Inc.*, 95 *F.C.C.*2d 1223, 1229–35, 1983 *WL* 182997 (1983). The FCC took that step to promote growth and increased competition in the field of satellite technology, which it labeled a concern "of increasing significance to the public at large." *Id.* at 1230. It reasoned that limiting regulation of satellite systems would best foster their growth, because "do[ing] away with redundant government regulation ... lowers the economic and procedural barriers inhibiting unrestricted competitive entry into the satellite field." *Id.* at 1231 (citation omitted).

One year later, Congress passed the Federal Cable Act, *Pub.L.* No. 98–549, 98 Stat. 2779 (codified as amended at 47 *U.S.C.* §§ 521 to 573), which adopted the dual, federal-state regulatory system first established by the FCC. Under that Act, all cable system operators must obtain a franchise from their local authority before providing service, § 541(b)(1), and local authorities may exercise various regulatory powers over franchisees largely relating to the non-operational aspects of cable service. Congress chose to preserve such state regulatory power because, like the FCC, it

recognized that "localities should be able to exert some control over cable because it crosses public rights of way." 129 *Cong. Rec.* 15,590 (1983) (statement of Sen. Hollings). Pursuant to that grant of authority by Congress, New Jersey enacted the New Jersey Cable Television Act, *N.J.S.A.* 48:5A–1 to –63, vesting the BPU with the power to regulate cable television companies.

Whether a cable provider falls within the ambit of the Federal Cable Act and is thus subject to state regulation hinges on whether its facility qualifies as a "cable system." The statute defines a "cable system" as

a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, *but such term does not include . . . a facility that serves subscribers without using any public right-of-way.*

[§ 522(7)(B) (emphasis added).]

Thus, facilities that do not "use" a public right-of-way are exempt from state regulation.

As noted, prior to the Federal Cable Act, the FCC had exempted SMATV systems on private property from regulation. After the passage of the Federal Cable Act, the FCC reaffirmed that position in *In re Definition of a Cable Television System,* in which it ruled that satellite signals are not closed transmission paths and do not "use" public rights-of-way within the meaning of § 522(7)(B). 5 *F.C.C.R.* 7638, 7639, 1990 *WL* 603007 (1990). Accordingly, when a SMATV system's rooftop satellite dish receives a signal, it can retransmit that signal by wires to residential units within the same building or to buildings in the same complex without ever "using any public right-of-way," § 522(7)(B), provided that the complex has only private streets.

## IV.

This Court, therefore, must determine whether a SMATV system that retransmits its satellite signal through wires that run underneath a building complex's public streets is "using any public right-of-way" within the meaning of § 522(7)(B) of the Federal

Cable Act. The BPU argues that § 522(7)(B)'s language mandates that such a system "uses" those streets and that the Court should not redefine "use" to mean "substantially use," as did the Appellate Division. RCN counters that the meaning of § 522(7)(B) is ambiguous and that exempting SMATV systems such as that of RCN best effectuates the congressional intent of fostering growth and competition within the cable industry. In deciding the question presented—whether RCN is subject to BPU regulation—we must examine the language of § 522(7)(B), its legislative history, and relevant agency interpretation of the provision.

A.

If the language of § 522(7)(B) is clear, then we must defer to that intent. *See American Tobacco Co. v. Patterson*, 456 *U.S.* 63, 68, 102 *S.Ct.* 1534, 1537, 71 *L.Ed.*2d 748, 755 (1982) ("[O]ur starting point must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used ... [a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.") (alteration in original) (citations and internal quotation marks omitted). We find, however, that the term "using," as employed in § 522(7)(B), is ambiguous. The Federal Cable Act does not define that term, nor does legislative history shed light on its proper interpretation. *Accord Guidry Cablevision/Simul Vision Cable Sys. v. City of Ballwin*, 117 *F.*3d 383, 385 (8th Cir.1997) (finding term ambiguous and noting absence of definition in Federal Cable Act and lack of helpful legislative history); *City of Mason City v. City Ctr. of Mason City, Inc.*, 634 *N.W.*2d 667, 671 (Iowa 2001) (finding term ambiguous and noting absence of definition in Federal Cable Act).

In the context of a cable facility, the meaning of "using" a public right-of-way has different connotations. It could encompass all wires running either above or below any public street no matter the distance covered, or it could except de minimis use or wires attached to buildings by private easements even when they cross

above a public street. Traditional definitions of the term "use" are not helpful. *Black's Law Dictionary* defines "use" as "[t]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of; to put into action or service, especially to attain an end." *Black's Law Dictionary* 1541 (6th ed.1990). Some courts have held that a SMATV system's wires do not "use" the public roads in a building complex because those roads are mere "obstacle[s] that must be overcome to serve the entire ... complex, not an asset in serving a myriad of independent subscribers." *Guidry, supra,* 117 *F.*3d at 385. However, the wires of a system such as that of RCN also are "carry[ing] out [the] purpose" of delivering cable service by means of crossing those rights-of-way. *Black's Law Dictionary, supra,* at 1541.

### B.

*Chevron, supra,* instructs us that if a statute is silent or ambiguous with respect to a specific issue, reviewing courts should look to the interpretation of the agency administering that statute. 467 *U.S.* at 842–43, 104 *S.Ct.* at 2781–82, 81 *L.Ed.*2d at 702–03. Because the ambiguous language of § 522(7)(B) and its legislative history do not resolve what constitutes "use" of a public right-of-way, we therefore consider whether the FCC has provided its own interpretation of that section.

We pause to note our disagreement with the BPU's claim that this Court should defer to the BPU's interpretation of the provision. Stated simply, we will not afford to the BPU the deference that *Chevron* provides to federal agencies interpreting federal law. "A state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes under [*Chevron* ]." *Orthopaedic Hosp. v. Belshe,* 103 *F.*3d 1491, 1495 (9th Cir.1997) (reviewing state agency's interpretation of federal Medicaid Act de novo) (citation omitted); *see also Michigan Bell Tel. Co. v. Strand,* 305 *F.*3d 580, 586 (6th Cir.2002) (affording *Chevron* deference to FCC's interpre-

tation of Telecommunications Act of 1996 but reviewing Michigan Public Service Commission's interpretation of same statute de novo). Moreover, although this Court has applied a *Chevron*-like deference to our state agencies' interpretations of state law, *see Matturri v. Bd. of Trs. of the Judicial Ret. Sys.*, 173 *N.J.* 368, 381–82, 802 *A.*2d 496 (2002), we find that applying any form of deference, whether under *Chevron* or our own jurisprudence, is inappropriate in these circumstances. If state courts applied deference to a local authority's interpretation of the Federal Cable Act, it would subvert Congress' goal of achieving "a national policy concerning cable communications." § 521(1); *see also Turner v. Perales*, 869 *F.*2d 140, 141 (2d Cir.1989) (reviewing state agency's interpretation of federal welfare statute de novo and stating that "*Chevron's* policy underpinnings emphasize . . . the need for coherent and uniform construction of federal law nationwide").

Accordingly, we return to whether the FCC has exercised its policymaking authority concerning the meaning of the term "using." Under *Chevron, supra,* we presume that Congress intended to vest the FCC with policymaking authority to fill in the Federal Cable Act's gaps, *see* 467 *U.S.* at 843–44, 104 *S.Ct.* at 2782, 81 *L.Ed.*2d at 703, and we defer to interpretations by the FCC unless they are "arbitrary, capricious, or manifestly contrary to the statute," *id.* at 844, 104 *S.Ct.* at 2782, 81 *L.Ed.*2d at 703. We find that in *Definition of a Cable Television System, supra,* 5 *F.C.C.R.* 7638, the FCC determined that closed transmission paths such as wires "use" a public right-of-way under the meaning of § 522(7)(B) when those paths cross the right-of-way. In the introduction to that rule, the FCC stated that it was seeking to "clarify [the FCC's] interpretation of the statutory term 'cable system' as defined in the Cable Communications Policy Act of 1984." *Ibid.* Then, in the rule itself, the FCC stated that when it had used the word crossing in its notice of proposed rulemaking, it had "not meant to imply anything different" from the statutory term "using." *Id.* at 7641–42. The FCC added that "[i]f the [SMATV] facility does cross a public right-of-way, it will be

considered a cable system for purposes of the Cable Act and our rules." *Id.* at 7642.

In addition to those FCC statements, we find persuasive the analysis and examples that the Iowa Supreme Court provided when it addressed this issue:

That the FCC interprets the word "uses" as synonymous with "crosses" is indicated in other reports it had issued as well. As early as 1985, the FCC, in a report and order regarding the implementation of the equal employment opportunity provisions of the Cable Act, stated: "The House Report on the Cable Act indicates that SMATV operators are subject to the EEO provisions regardless of whether the systems only serve commonly-owned apartments without *crossing* public rights of way." *In re Amendment of Part 76 of the Commission's Rules to Implement the Equal Employment Opportunity Provisions of the Cable Communications Policy Act of 1984,* 102 *F.C.C.*2d 562, 566[, 1985 *WL* 259971] (1985) (emphasis added). More recently, the FCC used similar language in a notice of proposed rulemaking and in an annual report to Congress. In its notice of proposed rulemaking, the FCC stated that private cable operators "do not use hard-wired *crossing* of public rights-of-way, and, therefore are not considered 'cable systems.' " *In re: Petition for Rulemaking to Amend Eligibility Requirements in Part 78 Regarding 12 GHZ Cable Television Relay Service,* 14 *FCC Rcd* 11967, 11,967 (1999) (emphasis added). In a recent annual report, the FCC similarly stated: "Under the 1996 Act, SMATV operators may use wires to connect separately owned buildings, so long as the wires do not *traverse* public rights-of-way." *In re Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming,* 22 Communications Reg. (P & F) 1414, 1442[, 2001 *WL* 12938] (2001) (emphasis added). *See generally Webster's Third New International Dictionary* 2433 (unabr. ed.1990) (defining "traverse" in part as "to go or travel across or over"). We conclude the FCC interprets the term "uses" to include the crossing of public right-of-way [sic] by physically closed pathways (cables), such as occurred in this case.

[*Mason City, supra,* 634 *N.W.*2d at 672–73.]

Not all courts that have addressed this issue share our view that the FCC has interpreted the meaning of "use" in § 522(7)(B). In *Guidry, supra,* the Eighth Circuit Court of Appeals found that "the Commission's Report and Order [in *Definition of a Cable Television System*] did not address whether crossing a public right-of-way by buried cable is 'use' for purposes of § 522(7)(b)." 117 *F.*3d at 386. Nonetheless, the court concluded that the FCC's statement that "[r]adio waves may cross a public right-of-way but do not use it," *ibid.* (citing *Definition of a Cable Television System, supra,* 5 *F.C.C.R.* at 7642), represents an express recogni-

tion by the FCC that "crossing is distinct from using," *ibid.* We respectfully disagree with the Eighth Circuit and read the phrase highlighted by the court, that radio waves may cross a right-of-way without "using" it, as applying only to wireless transmissions. In our view, that phrase is inapplicable to SMATV systems such as RCN's facility, which connects separate buildings through cables buried beneath public rights-of-way.

Similarly, in this appeal our Appellate Division labeled the FCC's statement in *Definition of a Cable Television System* that "use" is equivalent to cross as dicta, stating that "the F.C.C. was not attempting to answer the question which confronts this court, nor did it give reasons to support its assertion that crossing a public right-of-way constitutes a use of that right-of-way." *Alleged Non–Compliance by RCN of NY, supra,* 375 *N.J.Super.* at 22, 866 *A.*2d 235. The panel did not elaborate on its rationale for finding the FCC's interpretation to be dicta. It presumably did so because of the FCC's statement that in its notice of proposed rulemaking, the FCC

sought comment on whether facilities serving multiple dwellings that do not use public rights-of-way might in some instances be cable systems within the Act's definition. We further sought comment on the broader implications of treating facilities connected only by radio (or infrared) transmissions and making use of no other interconnecting wires or cables as cable systems.

[*Definition a Cable Television Sys., supra,* 5 *F.C.C.R.* at 7638.]

Although that statement standing alone might suggest that the ruling extends only to the regulatory status of purely wireless SMATV systems, thus excluding RCN, further consideration of the notice reveals that such is not the case. That notice also states that comments are "sought specifically with respect to the question of what constitutes a [sic] crossing a public right-of-way, including but not limited to the use of infrared technology." *In re Definition of a Cable Television Sys.,* 4 *F.C.C.R.* 2088, 2088, 1989 *WL* 512034 (1989) (notice of proposed rulemaking). Further, we find that the FCC did indeed justify its decision to equate "use" with cross. The FCC explained that states and localities should be able to regulate cable facilities with closed transmission paths that cross public rights-of-way because of the physical imposition

and "substantial construction upon" those rights-of-way by the closed transmission paths. *See generally Definition of a Cable Television Sys., supra,* 5 *F.C.C.R.* 7638.

Finally, *FCC v. Beach Communications, Inc.* suggests that if the United States Supreme Court were to confront the question we now face, it too would find that the FCC has interpreted "use" to mean cross. 508 *U.S.* 307, 311, 113 *S.Ct.* 2096, 2100, 124 *L.Ed.*2d 211, 220 (1993). In that case, the Supreme Court stated: *"Consistent with the plain terms of the statutory exemption,* the Commission concluded that such an SMATV system is subject to the franchise requirement if its transmission lines . . . use or cross any public right-of-way." *Ibid.* (citing *Definition of a Cable Television Sys., supra,* 5 *F.C.C.R.* at 7641–42) (holding that Federal Cable Act's previous requirement, that only cable facilities servicing buildings under common ownership are exempt from regulation, withstands rational basis review) (emphasis added).[1]

Because we find that the FCC has interpreted the term "using" in § 522(7)(B), we defer to that interpretation unless it is arbitrary or capricious, an issue we now explore.

## C.

Under *Chevron, supra,* we "need not conclude that the [FCC's] construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [that we] would have reached if the question initially had arisen in a judicial proceeding." 467 *U.S.* at 843 n. 11, 104 *S.Ct.* at 2782 n. 11, 81

---

[1] Only two other cases have discussed whether a SMATV system with wires running underneath or above public rights-of-way "uses" those rights-of-way. One case discussed the issue solely within the context of the private cable exemption's now repealed common ownership requirement. *Liberty Cable Co. v. City of New York,* 893 *F.Supp.* 191, 195 (S.D.N.Y.), *aff'd,* 60 *F.*3d 961, 963 (2d Cir.1995). The other issued its decision before the FCC's ruling in *Definition of a Cable Television System. Channel One Sys., Inc. v. Conn. Dep't of Pub. Util. Control,* 639 *F.Supp.* 188, 192, 199 (D.Conn.1986) (finding that SMATV system that runs thirty-five miles of coaxial cable underneath building complex's six public rights-of-way "uses" those rights-of-way).

*L.Ed.*2d at 703 n. 11 (citations omitted). This Court only must determine that the interpretation is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 *S.Ct.* at 2782, 81 *L.Ed.*2d at 703. We hold that the FCC's interpretation meets *Chevron's* deferential standard. Subjecting SMATV facilities to regulation when those facilities include wires that cross public rights-of-way is not arbitrary. Rather, that interpretation rationally relates to the intrusion of wires and cables on those rights-of-way while promoting growth and increased competition in the field of satellite transmission.

To be sure, the FCC has drawn a bright-line distinction between those facilities with closed transmission paths that cross public rights-of-way and those that do not. The FCC has premised that distinction on the fact that wires that cross public rights-of-way physically impose on those rights-of-way, whether that imposition involves excavation and drilling of roads to lay wires underneath, draping of wires over roads through the use of utility poles, attachment to buildings, or the like. Because many of the local regulatory powers triggered by such a crossing under the FCC's interpretation relate directly to the ability and right of municipalities to manage and seek compensation for that physical intrusion, the FCC's interpretation is rational. *See, e.g.,* § 541 (allowing local authorities to determine physical boundaries of cable company's franchise based on layout of municipality); § 542 (allowing local authorities to charge franchise fees). *Accord Mason City, supra,* 634 *N.W.*2d at 673–74 (finding FCC's "use"-equals-"cross" interpretation logically related to local government's ability to operate and maintain rights-of-way).

Further, the interpretation is reasonable not only because it enables municipalities to manage and seek compensation for the physical intrusion of wires on their public roads, but also because it promotes the growth of wireless technology. As explained above, the FCC has long exempted wireless video providers from regulation to entice investment in the field of satellite transmission. *See Earth Satellite Communc'ns, supra,* 95 *F.C.C.*2d at

1230–32 (exempting from regulation SMATV systems that receive wireless signal into antennas stationed on private property). When reviewing that policy, other courts have found exemption from regulation to be a rational means of achieving technological expansion. *See, e.g., New York State Comm'n on Cable Television v. FCC,* 749 *F.*2d 804, 811–12 (D.C.Cir.1984) (finding FCC's reliance on market forces rationally related to goal of promoting growth in SMATV industry); *see also Beach Commc'ns, supra,* 508 *U.S.* at 320, 113 *S.Ct.* at 2105, 124 *L.Ed.*2d at 226 (Stevens, J., concurring) ("Regulation is sometimes necessary, but it is always burdensome."). We agree that freedom from obtaining a franchise, annual fees, compliance with local customer service laws, and all of the other responsibilities concomitant with regulation, is a rational means of motivating companies to pursue research, development, and investment in the wireless field.

As with any bright-line rule, the FCC's "use"-equals-"cross" interpretation may yield all-or-nothing type results, subjecting a facility that crosses one public right-of-way with twenty feet of wire to the same regulatory burdens as a facility servicing an entire town with thousands of feet of wire. Yet, the nature of that approach, which makes no distinction between "use" and "substantial use," does not render it arbitrary or capricious. To the contrary, it has the distinct advantage of providing a clear rule of law to interested parties, public agencies, and courts, obviating the need for hapless and highly fact-specific court and agency determinations. Finally, if Congress had intended to carve out an exception for minimal use, it could have done so expressly. Section 522(7)(B) does not evidence such an intent.

### V.

Applying the FCC's interpretation to the facts of this appeal, and because RCN admits that its wires cross River Drive South and Newport Parkway, we conclude that RCN's Newport facility constitutes a "cable system" under the meaning of § 522(7)(B) and is subject to BPU regulation. We add only that,

concerning the Appellate Division's comment that RCN should not be "subject to the regulatory jurisdiction of the BPU as a result of an action taken years after it commenced operation," *Alleged Non-Compliance by RCN of NY, supra,* 375 *N.J.Super.* at 23, 866 *A.*2d 235, we find no reason to grandfather RCN. When RCN assumed operation of Newport's SMATV facility in 1996, it was or should have been aware that the facility's wires run underneath roads that had been dedicated to the public in prior years.

We, therefore, reverse the judgment of the Appellate Division and remand the matter to the BPU for proceedings consistent with this opinion.

*For reversal*—Chief Justice PORITZ, and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE, and RIVERA–SOTO—7.

*Opposed*—None.